UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MICHIGAN ELECTRICAL EMPLOYEES PENSION FUND,  | Case No. 1:07-cv-140
MICHIGAN ELECTRICAL EMPLOYEES  HEALTH PLAN,  |
NATIONAL ELECTRICAL BENEFIT FUND,  |
NATIONAL ELECTRICAL ANNUITY FUND,  |
LANSING ELECTRICAL JOINT APPRENTICESHIP  |
AND TRAINING COMMITTEE TRUST, and  |
LANSING LABOR-MANAGEMENT COOPERATION FUND,  |
  |
     Plaintiffs,  | HONORABLE PAUL L. MALONEY
  |
       v.  |
  |
ENCOMPASS ELECTRIC & DATA, INC.;  |
ENCOMPASS ELECTRIC & TELECOM, INC.;  |
JAMES K. PRICE, JR., both individually and d/b/a Encompass  |
Electric & Data, Inc.; and KEVIN GLANZ,  |
both individually and d/b/a Encompass Electric  |
& Data, Inc. and d/b/a Encompass Electric & Telecom, Inc.  |
  |
     Defendants.  |
_____

**Opinion and Order**
**Granting the Plaintiffs' Motion for Summary Judgment as to the Federal Claims;**
**Declining Jurisdiction over the State-Law Claim**

This is an action for pension, medical, and other employee fringe-benefit contributions and

other relief under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C.

§ 1131 *et seq.* ("ERISA"); the Labor-Management Relations Act, as amended, 29 U.S.C. § 185 *et*

*seq.* ("LMRA"); and the Michigan Building Contract Fund Act, M.C.L. § 570.151 *et seq.*

("MBCFA").  The plaintiffs have filed a motion for summary judgment.  For the reasons that follow,

the court will grant summary judgment on Count I (Data's failure to pay delinquent contributions);

Count II (Telecom's liability for said contributions as alter ego of Data); and the portion of Count

III which claims that Price and Glanz breached their fiduciary duties under ERISA and thus are personally liable for Data/Telecom's CBA obligations. The court will deny the plaintiffs' motion (without prejudice) as moot as to any claim that Price and Glanz should be held personally liable on additional grounds, such as piercing the corporate veil of Data and/or Telecom. Having disposed of all the federal claims, the court will follow our Circuit's usual practice and decline supplemental jurisdiction over the plaintiffs' MBCFA claim (a portion of Count III).

The court will retain jurisdiction and keep the case open in order to determine the amount of the defendants' liabilities.

As to the grant of summary judgment to the plaintiffs on Count I, the court determines that defendant Encompass Electric & Data, Inc. ("Data") entered into a valid, enforceable, written contract when defendant James K. Price, Jr., in his role as Data's President, signed letters of assent that required Data to adhere to three collective-bargaining agreements ("CBAs"). First, even if the court accepted Price's allegation that he was not given and did not read the CBAs before signing the letters, that would not prevent the formation or enforcement of the contract under these circumstances. Second, even if the court accepted Price's allegation that the union's business manager orally represented that Data would not be required to adhere to those CBAs for a period of time, such an oral representation cannot affect a modification of the written contract under our Circuit's ERISA law. Third, as a matter of law, under published Sixth Circuit precedent interpreting ERISA and LMRA, customary state contract-law defenses such as waiver and estoppel are not available in an action to collect employee benefits due under the express terms of a written CBA (or a writing that incorporates or binds a party to a CBA). Fourth, the court determines that those CBAs required Data to make the benefit contributions calculated by the plaintiffs for the period October

10, 2003 through December 2004, and that Data did not make said contributions.  Fifth, the court determines that the CBAs require the defendants to make Data's records *and defendant Encompass Electric & Telecom, Inc. ("Telecom")'s records* available to the plaintiffs so they can conduct an audit and ascertain whether Data/Telecom has additional liabilities from December 2004 onward.

As to the grant of summary judgment to the plaintiffs on Count II, the court determines that defendant Encompass Electric & Telecom, Inc. ("Telecom") is the alter ego of Data and, during any period when they existed and operated simultaneously, formed a "single enterprise" or "double-breasted employer" with Data.

As to the grant of summary judgment to the plaintiffs on Count III, the court determines that Price and Glanz were ERISA fiduciaries and breached their ERISA fiduciary duties by failing to make the benefit contributions and reports required by the CBAs on behalf of Data and Telecom, rendering them personally liable for those liabilities of Data and Telecom.

In light of this disposition, the court will not consider whether Price and Glanz might also be held personally liable for those same obligations under the federal piercing-the-corporate-veil doctrine and/or "due to their failure to maintain the corporate status of EED," *see* Comp. ¶ 35.  Nor will the court consider the state-law claim embedded in Count III, which the plaintiffs may attempt to pursue in state court if they wish.

**BACKGROUND**

The Parties

The plaintiffs – the Michigan Electrical Employees' Pension Fund, the Michigan Electrical Employees Health Plan, the National Electrical Benefit Fund, the National Electrical Annuity Fund,

the Lansing Electrical Joint Apprenticeship and Training Committee Trust, and the Lansing Labor-Management Cooperation Fund (collectively "the Fund") – were established through a collective-bargaining process and are administered pursuant to the Labor-Management Relations Act of 1947, codified at 29 U.S.C. § 186 *et seq.*, as amended ("LMRA") and the Employee Retirement Income Security Act of 1974, codified at 29 U.S.C. § 186 *et seq.*, as amended ("ERISA").  Am. Comp. ¶ 1.

Data was formed on September 4, 2003,  had its principal place of business in Grand Ledge, Michigan, and conducted business as an electrical contractor in the Lansing, Michigan area.  *See* Defs.' Opp'n, Ex A (Affidavit of James K. Price dated Feb. 27, 2008 ("Price Aff")) ¶ 9.  When Data was formed, it employed defendant James K. Price ("Price") as President and defendant Glanz as Secretary.  *Id.*  Data operated out of Price's home, used Glanz's cellular telephone as its business line, and primarily used tools, and a van, already owned by Price and Glanz.  *Id.*

Data filed a certificate of dissolution with the State of Michigan in June 2005, Am. Comp. ¶ 2, so by operation of law it was dissolved at that time.[1]  Data took its last new work order on May 20, 2005, *see* Opp'n Ex H (Data's "job book"), and after Data's dissolution "[a]ll project owners for whom Telecom submitted bids or performed work were clearly notified in writing that the bids were

---

[1]

M.C.L. § 450.1831 provides that a corporation is dissolved when it files a certificate of dissolution pursuant to M.C.L. § 450.1803-1805, the period stated in its articles of incorporation expires, a court enters a judgment of dissolution or forfeiture of corporate franchise, or it fails to file an annual report or pay the annual filing fee required by M.C.L. § 450.1922.  A dissolved Michigan corporation continues its corporate existence but is not permitted to carry on business except for the purpose of winding up its affairs by collecting its assets, paying its debts and other liabilities, selling or otherwise transferring assets which are not distributed in kind to its shareholders, and "doing all other acts incident to liquidation of its business and affairs."   M.C.L. § 450.1833.

Moreover, unless otherwise ordered by a court, a dissolved corporation "may sue and be sued in its corporate name and process  may issue by and against the corporation in the same manner as if dissolution had not occurred."  M.C.L. § 450.1834(e).

-4-

submitted and the work was being performed by Telecom."  Opp'n Ex A (Price Aff.) ¶ 22.

Defendant Telecom is also a corporation that did business in the construction industry and had its principal place of business in Grand Ledge, Michigan, and it remains intact.  Am. Comp. ¶ 3; *see also* Ans. ¶ 3 (admitting that Telecom is a Michigan corporation with a registered office in Grand Ledge but refusing to state where its principal place of business is).

Price and Glanz both do business as Data and Telecom, and they are both shareholders in Data.  Am. Comp. ¶¶ 4-5.  Data is no longer in existence and no longer conducting business, but Price and Glanz were shareholders and officers of Data before its June 2005 dissolution.  Ans. ¶ 4.

The Alleged Contract

In the fall of 2003, Price contacted IBEW Local 665 business manager Bill Patrick ("Patrick") to inform him that he and Glanz had formed Data.  Price Aff ¶ 4.  Patrick advised Price to sign onto the Local's collective bargaining agreements ("CBAs") so that Data would not have problems with the union.  *Id.*  According to the defendants, Price expressed concern that Data could not afford to pay union wages and benefits and remain competitive, and Patrick responded that Data would not be required to pay union wages and benefits until Data "got on its feet."  Price Aff ¶ 5; *see also* Defs.' Opp'n (Deposition of James K. Price dated Jan. 17, 2008 ("Price Dep")) 36:4-14.

On October 10, 2003, Price signed three letters of assent in his role as president of Data.  The first letter of assent provided, in pertinent part,

> In signing this letter of assent, the undersigned firm does hereby authorize [the] Michigan Chapter, Lansing Division, Nat'l Electrical Contractors Assoc as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved RESIDENTIAL labor agreement between the MI Chapter, Lansing Div, Nat'l Electrical Contractors Assoc and Local Union 665, IBEW
>
> In doing so, the undersigned firm agrees to comply with, and be bound by, all of the

-5-

provisions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the 10th day of Oct., 2003.  It shall remain in effect until terminated by the undersigned employer giving written notice to the MI Chapter, Lansing Div, Nat'l Electrical Contractors Assn and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement.

The Employer agrees that if a majority of its employees authorize the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980, in Civil Action HM-77-1302, if the undersigned employer is not a member of the National Electrical Contractors Association, this letter of assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

Am. Comp. Ex. A (or Defs.' Opp'n Ex G) at 1.

The second letter of assent appears substantively identical to the first, except that it authorizes NECA to be Data's collective-bargaining representative as to all matters contained in or pertaining to the current and subsequently approved "Sound & Communications" labor agreement between NECA's Lansing Division and Local 665.  Am. Comp. Ex. A (or Defs.' Opp'n Ex G) at 2.  The third letter of assent appears substantively identical to the first, except that it authorizes NECA to be Data's collective-bargaining representative as to all matters contained in or pertaining to the current and subsequently approved "Inside" labor agreement between NECA's Lansing Division and Local 665.  Am. Comp. Ex. A (or Defs.' Opp'n Ex G) at 2.  IBEW Local 665's Business Manager, William L. Patrick, signed each of the three letters on behalf of the Union on an unspecified date, and each of the three letters bears a stamp reading "APPROVED International Office - I.B.E.W. OCT 21 2003 Edwin D. Hill President."  Am. Comp. Ex. A (or Defs.' Opp'n Ex

G) at 1-3.

The Fund contends that by Price signing these three letters of assent, Data became a party to the Residential, Sound & Communications, and Inside collective bargaining agreements ("CBAs") then in effect, and subsequently entered into, between NECA and the Union, as well as the trust agreements incorporated by reference into the CBAs. Am. Comp. ¶¶ 6-7. The defendants' answer admits only that Data signed "certain collective bargaining agreements." Ans. ¶¶ 6-7.

The defendants allege that Price was never shown any of the three CBAs to which the letters of assent bound Data. Price Aff ¶ 7. They further allege that the Local's business manager, Patrick, agreed to evaluate the status of Data at the end of 2004 to determine whether Data could remain a union contractor; if not, Patrick allegedly assured him, the relationship between Data and the Local would cease. Price Aff ¶¶ 5-6.

The Benefits Dispute

The Fund contends that the CBAs obligated Data to make contributions to plaintiffs towards the medical, pension, and other benefits of Data employees who performed work covered by the CBAs, to file reports, and to let the plaintiffs periodically inspect and audit Data's payroll and work records. Am. Comp. ¶¶ 8 & 12.

Data's corporate status was officially dissolved in June 2005, and the defendants allege that it no longer conducts business or maintains a principal place of business. Ans. ¶ 2; *see also* MSJ, Ex. K (Certificate of Dissolution signed by Price and filed on June 9, 2005 with the Michigan Dep't of Labor & Economic Growth, Bureau of Commercial Services). The Fund insists that Data was not relieved of its CBA obligations by Price's May 2005 letter stating that Data had "closed its doors." Am. Comp. ¶ 9. Price testified that he and Glanz dissolved Data because the cost of its

-7-

CBA obligations made its bids uncompetitive, and he admitted that the desire to eliminate the expense of the CBA obligations was at least one of the reasons for forming Telecom:

> Q.    Okay.  To make things a little easier on our report we will refer to Encompass Electric & Data [Data] simply as Data, and Encompass Electric & Telecom [Telecom] simply as Telecom.  Okay?
>
> A.    Okay.
>
> Q.    I understand that Data [Data] closed its doors and dissolved approximately on June 9, 2005.  Is that true?
>
> A.    Yes.
>
> Q.    Why did the company close?
>
> A.    Financially we were, we could not make the union program work for us.
>
> Q.    Could you explain a little more what you mean by that?
>
> A.    The structure of the union, the wage and benefit package, we could not compete.
>
> Q.    The cost of Telecom paying the obligations under the collective bargaining agreement were [sic] too high and made your bids uncompetitive, is that what you're saying?
>
> A.    Yes, for our company.  Yes.
>
> * * *
>
> Q.    Is that also why you formed the Telecom company?
>
> A.    I think that's one of the reasons.
>
> Q.    What are the other reasons?
>
> A.    I guess to be more competitive in the market.
>
> Q.    Is Telecom a union contractor?
>
> A.    No.

MSJ Ex. B at 5:4 to 6:4 (omitting question that characterized Telecom as "successor" to Data, and defense counsel's objection thereto); *see also id.* at 7:10-12.

Count 1 alleges that Data failed to pay employee-benefit contributions that were required under the CBAs to which the letters bound it.  The Fund calculates that Data's delinquent contributions for the period October 2003 through December 2004 amount to nearly $58,000,

-8-

including contractual late charges or liquidated damages.  Am. Comp. ¶ 15.  Specifically, the Fund's

audit determined that Data was liable for the following unpaid employee benefits under the CBAs:

| Fund | Amount Due | Assessments | Total Due |
|------|-----------|-------------|-----------|
| Health Care | $30,946.32 | $ 5,990.62 | $36,936.94 |
| Pension | $ 7,418.92 | $ 1,422.31 | $ 8,840.68 |
| NEAP | $ 3,791.92 | $  758.38 | $ 4,550.30 |
| NEBF | $  425.59 | $   85.11 | $  510.70 |
| JATC | $ 1,542.53 | $  370.20 | $ 1,912.73 |
| LMCC | $  581.48 | $    0.00 | $  581.48 |
| NLMCC | $   38.56 | $    0.00 | $   38.56 |
| Dues | $ 3,085.07 | $    0.00 | $ 3,085.07 |
| AMF | $  578.23 | $    0.00 | $  578.23 |
| NEAP & NEBF Interest: | | | $  848.15 |
| TOTALS: | $48,408.07 | $ 8,626.62 | **$57,882.84** |

MSJ Ex. C or Defs.' Opp'n Ex F (Dec. 21, 2006 Post-Audit Letter from Fund Payroll Auditor

Steven K. Homer to Data) (boldface in original); *see also* MSJ Ex. J (May 17, 2006 letter requesting

audit and June 3, 2005 letter noting Data's initial lack of cooperation with said request).  The

defendants have not lodged any specific objection to the Fund's Oct. 2003 - Dec. 2004 audit.[2]

The Fund explains that it cannot determine the amount of Data's delinquent contributions

for the period January 2005 through the present (if any) until the defendants submit the applicable

records for inspection and audit.  Am. Comp. ¶ 17.

It is undisputed that Data did not pay any fringe-benefit contributions at any time during its

---

[2]

*See generally Fuchs v. Cristal Concrete Corp.*, No. CV-04-1555-ETB, slip op. at 11
(E.D.N.Y. July 18, 2006) (noting employer's duty under 29 U.S.C. § 1059(a)(1) to keep accurate
records of hours worked, and discussing when an employer has the burden to provide evidence as
to the amount of work performed, or evidence regarding the inaccuracy of the assumptions made
during a union's audit) (citing *Local 282 Welfare Trust Fund v. A. Morrison Trucking, Inc.*, 1993
WL 120081, *1 (E.D.N.Y. Mar. 30, 1998)).

existence.  The defendants maintain, however, that this is because Price's "oral agreement" with Patrick modified the written contract (the letters of assent) so as to permit Data not to make such contributions until and unless Data indicated that it could afford to do so.  *See* Defs. Opp'n at 2 ("*Consistent with Data's verbal agreement with Local 665*, Data never submitted any monthly payroll reports nor did it pay any fringe benefit contributions, dues, or union scale wages while in business.") (emphasis added).  The defendants cite Price's deposition testimony that Data never submitted monthly contribution reports to the union, and in fact "[n]ever submitted any other piece of paper work to the union" after signing the letters of assent.  *See* Price Dep at 36:20-24.  The defendants also cite Price's claim that the local never requested that Data submit monthly contribution reports or pay any fringe-benefit contributions, nor did the local even explain how much Data should pay or how it should pay.  *See* Price Aff ¶ 7 and Price Dep at 39:12-18 ("Q. * * * But you did not pay any contributions to the fringe benefit funds based on those hours of work because you say that there was a verbal agreement with Mr. Patrick that the company didn't have to?  A. That and we would have had no idea of what to pay or who to pay.  We never received any other paperwork or anything from the union hall.")).

The Fund responds that

[w]hether or not such a[n oral] commitment was ever made by Mr. Patrick is ultimately irrelevant to the resolution of this lawsuit.  Agreements, such as this one, under which employers commit to make contributions on behalf of their employees to fringe benefit funds, occupy a special status under law – such agreements must be in writing and cannot be orally modified.

These restrictions initially stem from Section 302(a) of the LMRA, 29 USC § 186(a), which prohibits, with certain exceptions, an employer from contributing funds to various employee representatives.  One of these exceptions, applicable here, is § 302(c)(5)(B) of the LMRA, which permits payments to and from a trust fund for the benefit of employees, provided that such payments are made in accordance with a written agreement with the employer.  29 USC § 186(c)(5)(B).

-10-

As a result of the requirement that employer contribution to trust funds must be made pursuant to a written agreement, the courts have concluded that such agreements must be enforced as written and cannot be orally modified.

Fund's Reply at 3 (citing *Central States Pension Fund*, 883 F.2d 454, 459-60 (6th Cir. 1989) and

*Kemmis v. McGoldrick*, 706 F.2d 993, 996 (9th Cir. 1990)).

<u>The Relationship Between Data (Dissolved June 2005) and Telecom (Still Doing Business)</u>

Count 2 alleges that although Data was the signatory on the letters of assent, Telecom is also jointly and severally liable for delinquent contributions pertaining to employees of both Data and Telecom because the two companies "have been operating as a single integrated enterprise and/or together constitute a joint employer, and/or are the alter ego of one another, and/or function as a double-breasted employer . . . ."  Am. Comp. ¶ 22.

To substantiate this claim, the Fund alleges that Data and Telecom have had common employees, common management and supervision, common control of labor relations, similar working conditions, similar job classifications and job functions, have performed the same or similar services for customers in the same geographical area, and shared common operations.  Am. Comp. ¶ 20.  The Fund further alleges that Data sought to improperly avoid liability for such contributions by having work covered by the CBAs done by employees who were nominally on Telecom's payroll instead of its own payroll.  Am. Comp. ¶ 21.  The defendants deny that Data was an alter ego of Telecom; they emphasize that Data was a separate entity from Telecom and therefore not liable for any of the latter's obligations under the CBAs.  Ans. ¶¶ 10 & 19-22 & 36.

The defendants allege that Price told the local orally in December 2004 that Data was closing, *see* Price Aff ¶ 12, and that Price faxed written notice of the same to the local on May 16, 2005, *see* Price Aff ¶ 12 and Defs.' Opp'n Ex C.  The defendants claim that Price signed the

necessary paperwork to dissolve Data on December 10, 2004 but did not actually file that paperwork with the State of Michigan until June 2005, "when Data's operations were fully closed down"; during the intervening months, Data "completed existing jobs, collected outstanding accounts, and paid outstanding bills, and eventually, closed its bank account."  Defs.' Opp'n at 3 (citing Price Aff ¶ 14); *see also* Defs.' Opp'n. Ex D (June 9, 2005 Certificate of Dissolution for Data).

According to the defendants, Price, Glanz, and Price's wife Gloria, formed the new company, Telecom, in December 2004, but did not begin operations until after Data was dissolved in June 2005.  Defs.' Opp'n at 4 (citing Price Aff ¶ 15 and Price Dep at 11 & 13).  The defendants insist that the two companies had "no overlapping operations."  Defs.' Opp'n at 4 (citing Price Dep at 11 & 13).  During the same period when Price and Glanz were winding down Data's operations, they took steps in preparation for the formal creation of Telecom: they opened a new bank account for Telecom in January 2005, purchased a "Yellow Book" telephone-directory listing for Telecom, and printed various corporate forms for Telecom.  *See* Price Aff ¶ 16 and Defs.' Opp'n Ex E (Telecom corporate forms).

The defendants emphasize that the Fund did not demand any CBA benefit contributions from the defendants until a letter dated January 30, 2006, which was more than seven months after Data officially dissolved.  Price Aff ¶ 19 and Defs.' Opp'n Ex F (letter).

<u>Price & Glanz's Roles with Data (Dissolved June 2005) and Telecom (Still Doing Business)</u>

Count 3 claims that Price and Glanz breached their fiduciary duties under ERISA and the Michigan Building Contract Fund Act, M.C.L. § 570.151 *et seq.* ("MBCFA").  Am. Comp. ¶¶ 29-31.  Specifically, it alleges that as officers and shareholders of Data and Telecom, Price and Glanz made personal use of fringe-benefit funds accrued by Data and Telecom employees – instead of remitting

-12-

those funds to the trust fund the plaintiffs had created for that purpose pursuant to the MBCFA – and refuse demands that they pay those funds into the trust.  Am. Comp. ¶¶ 24-28 and 32.  The Fund contends that Price and Glanz are individually liable for the fringe-benefit funds not paid into the trust because they violated their fiduciary duties.  Am. Comp. ¶ 33.  Price and Glanz deny that they received any funds that were subject to an MBCFA employee benefit trust or that they were required to make payments into any such trust, Ans. ¶¶ 24-33, and they contend that the Fund has "not identified any specific funds for which a fiduciary duty or trust attached," Defs.' Opp'n at 5.

Count 4 claims that Price and Glanz are individually liable for Data's debts, namely its delinquent benefit trust payments, due to their failure to maintain Data's corporate status.  Finally, the Fund claims that Price and Glanz are also individually liable for Telecom's debts due to their failure to maintain Data's corporate status because the two entities constituted a "double-breasted" single employer (i.e., Telecom is Data's alter ego).  Am. Comp. ¶¶ 35-36.  The defendants respond that the Fund does "not . . . identify any incidences of commingled assets, or other indicators that Data was treated as anything other than a separate entity by Price and Glanz," Defs.' Opp'n at 5.

## PROCEDURAL HISTORY

The Fund filed the complaint in February 2007 and the case was assigned to the Honorable Richard Alan Enslen.  In March 2007, all defendants except the dissolved Data were served, and all four defendants filed a joint answer; the defendants did not contest jurisdiction or venue in their answer or otherwise, *see* Am. Comp. ¶¶ 10 & 11.  The defendants assert twelve affirmative defenses.  Among other things, they contend that the Fund's claims are barred by its dissolution and termination of operations in June 2005; that the Fund's attempt to hold Data liable for Telecom's CBA obligations is barred by the fact that the two entities were not alter egos; and that the Fund's

attempt to hold Price and Glanz liable is barred because there is no basis for piercing the corporate veil of Telecom or Data.  Ans. at 8-9.

Judge Enslen held a case management conference and issued a scheduling order in May 2007.  In August 2007 the case was reassigned to this Judge, who issued an amended case management order in January 2008.  In January 2008, the Fund moved for leave to amend the complaint to add a fifth defendant, Gloria Price.  The motion was referred to Magistrate Judge Carmody for disposition pursuant to 28 U.S.C. § 636(b)(1)(A); after receiving opposition and reply briefs and hearing oral argument on March 3, 2008, the Magistrate Judge denied leave to amend, without opinion, for the reasons stated on the record at said hearing.

On January 31, 2008 the Fund moved for summary judgment.  The defendants filed a timely opposition brief on February 28, 2008, and the Fund filed a timely reply brief on March 17, 2008.

## LEGAL STANDARD: SUMMARY JUDGMENT

Summary judgment is proper if the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Conley v. City of Findlay*, – F. App'x –, 2008 WL 227331, *5 (6th Cir. 2008) (quoting FED. R. CIV. P. 56(c)).  The movant  has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law.  *Id.* at *3 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644, 691 (6th Cir. 2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), *cert. denied*, – U.S. –, 2008 WL 423556 (U.S. Feb. 19, 2008), and view the evidence in the light most favorable to the non-movant, giving it the benefit of all reasonable inferences.  *Fox v. Eagle*

-14-

*Dist. Co., Inc.*, 510 F.3d 587, 592 (6th Cir. 2007) (Griffin, J.).

 A moving party without the burden of proof need show only that his opponent cannot sustain its burden at trial. *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 787 (6th Cir. 2000; *see also Minadeo v. ICC Paints*, 398 F.3d 751, 761 (6th Cir. 2005).[3]  A moving party that has the burden of proof, however, faces a "substantially higher hurdle."  *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *see also Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  "Where the moving party has the burden – the plaintiff on a claim for relief or the defendant on an affirmative defense – his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. US*, 799 F.2d 254, 259 (6th Cir. 1984) (citation omitted).  Our Circuit has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."  *Arnett*, 281 F.3d at 561 (citation omitted).  Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact."  *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

---

[3]

 Typically, it is a defendant who moves for summary judgment.  In that case, the defendant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, the movant's initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . ."  *Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 654 (W.D. Mich. 1999) (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)), *aff'd o.b.*, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. Nov. 2, 2000).  The plaintiff would have to present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts."  *Conley*, 2008 WL 227331 at *3 (quoting *Moore*, 8 F.3d at 339-40).

**DISCUSSION**

**There Is No Genuine Issue as to Whether Data was Bound by the CBAs:  It Was**

<u>The Parties' Arguments</u>

The defendants admit that Price, in his role as president and shareholder of Data, signed the letters of assent binding Data to the CBAs.  The defendants do not contend that the letters of assent or the CBAs were invalid or unenforceable, nor do they deny that the CBAs required Data to make contributions for employee medical benefits, pension contributions, and other employee benefits and programs, of the type and in the amount alleged by the Fund.  Instead, the defendants argue that the local's business manager orally modified the letters of assent to provide for an indefinite deferment of Data's obligation to comply with the CBA's requirements to file reports, submit to audits, and make employee-benefit contributions.  *See* Defs.' Opp'n at 7.

Alternately, the defendants contend that the Fund waived its right to demand compliance with those CBA terms because it failed to provide copies of the CBA to the defendants until this litigation started, failed to demand audits or reports, and failed to demand benefit contributions until January 30, 2006 – which was over seven months after Data was officially dissolved (June 9, 2005), over eight months after Price gave written notice that Data would be dissolved (May 16, 2005), at least thirteen months after Price allegedly orally informed the Fund that Data would be closing (sometime in December 2004), and more than two years and two months after Price signed the letters of assent on Data's behalf (October 10, 2003).

<u>The Fact that Price signed the Letters of Assent without Receiving the CBAs</u>
<u>Does Not Render the Letters Unenforceable</u>

Because the letters of assent expressly incorporated the CBAs by reference and obligated the parties to abide by them, the court must read the letters and the CBAs together and give effect to all

-16-

the documents.  *See North Pointe Dealings, Inc. v. Argo Int'l, Inc.*, 2008 WL 192287, *5 (E.D. Mich. Jan. 23, 2008) ("When a written document refers to a separate document for additional contract terms, the court must read the writings together . . . . ") (citing *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001) (citing *Forge v. Smith*, 580 N.W.2d 876 (Mich. 1998))).

The defendants complain, however, that Price was never given a copy of the CBAs before signing the letters of assent that obligated Data to abide by them.  Indeed, Price alleges that the Fund did not provide him with the CBAs until it initiated this lawsuit, well after Data was officially dissolved and no longer conducting business.  Because the defendants are opposing summary judgment, the court must accept as true their allegation that Price was not given the CBAs to review before he signed the letters of assent on Data's behalf.

Even so, that does not provide a basis for concluding that no contract was formed because there was no meeting of the minds or otherwise.  Under Michigan law, "[p]arties generally have a duty to read a contract and know what they are signing."  *Idearc Media Corp. v. Hettinger & Hettinger, P.C.*, 2007 WL 2572000, *3 (W.D. Mich. Sept. 4, 2007) (citing, *inter alia*, *Stopczynski v. Ford Motor Co.*, 503 N.W.2d 912, 913 (Mich. App. 1993) (per curiam) (P.J. Cavanagh, MacKenzie, Griffin)).

As a necessary prelude to reading all contract documents, ordinary diligence and common sense should lead a person to obtain a copy of all documents that will define the parties' rights and duties before he decides whether to enter into the contract.  This is particularly true where, as here, the person is signing a contract that may well affect the very survival of a company that he founded, capitalized, and depends on for his livelihood.  *See Campbell v. Upjohn Co.*, 498 F. Supp. 722, 730

-17-

(W.D. Mich. 1980) (in dispute over merger agreement, court rejected Campbell's explanation that he relied on other party's oral assurance that he would receive a certain payment even though such payment was not guaranteed by the written agreement) ("Above all and before all else, Campbell should have read the Agreement.  A reasonable person must be charged with knowledge of a document with its magnitude and import. * * * Surely a person should be expected to apprise himself of the contents of an agreement he signed and helped to negotiate, and which sold out his interest in a company he helped to build."), *aff'd*, 676 F.2d 1122 (6th Cir. 1982).

If Price signed the letters of assent without seeing the CBAs, that was a voluntary choice, and he alone is to blame if the CBAs imposed too onerous a burden on Data.  *See Mishawaka Woolen Mfg. Co. v. Stanton*, 154 N.W. 48, 52 (Mich. 1915) ("It was claimed that the reservation of title was fraudulent because it was in fine print, and the attention of the purchaser was not called to it. * * *  [But *h]e should have read it, and if he did not do so, he alone is to blame*.") (emphasis added).

The court notes that Price has not alleged that he asked for the CBAs and the union refused to provide them, unreasonably delayed in providing them, or otherwise prevented him from reading them.  *Cf. Prose v. Sun & Ski Marina*, 2004 WL 2827197, *2 (Mich. App. Dec. 9, 2004) ("[D]efendant asserts that plaintiff had a duty to read the contract [for purchase of ] and cannot invalidate it on the ground that he failed to do so. * * * [P]laintiff's assertion that he was tricked into signing the purchase contract because he thought it was merely confirming price and delivery is another attempt to contradict his deposition testimony that he signed the contract on or about November 1, 1990, and that *defendant did not prevent him from reading it*.") (emphasis added).

The court also notes that Price has not alleged that the CBAs were too long, complicated,

unclearly phrased, or finely printed to comprehend even if he had obtained copies to review before signing the letters.  Under the circumstances of a transaction between commercial entities (not a consumer and a commercial entity), such a complaint would likely be of no avail under Michigan common law anyway.  Nor does it matter that Price might have found the CBAs difficult to comprehend; he could have demanded time to consult an attorney for an explanation of their terms. *See H.H. King Flour Mills Co. v. Bay City Baking Co.*, 214 N.W. 973, 975 (Mich. 1927) ("[I]t is claimed that the contract was a long one, printed on both sides of a single sheet in extremely small type; that it was complex, difficult of understanding, and unreasonable; and that it was not explained to him; that because thereof he is not bound by its terms. * * * We think the claim without merit. Defendant could and should have read it[4], and, if not understandable, obtained its explanation before signing."); *Royal Property Group, LLC v. Prime Ins. Syndicate, Inc.*, 706 N.W.2d 426, 438 n.11 (Mich. App. 2005) ("Notably, the trial court dismissed with prejudice the count for fraud . . . .  The trial concluded that Royal failed to show that it reasonably could have relied on Prime's alleged

---

[4]

*Accord Graves & Barnewell v. Boston Marine Ins. Co.*, 2 Cranch 419, 436, 1805 WL 1075, *11 (U.S. Feb. Term 1805) (Marshall, J.) ("The insurance was made on [the basis of an instrument], which contained the name of no person to be insured by Graves.  This is a sealed instrument, and yet it is attempted to set it aside on the grounds of mistake, in the omission of a name, when the only name given by the plaintiffs' agent was inserted.  It appears . . . that Andrew Sigourney read the policy deliberately before he gave the premium note.  But *if he did not read it, it was his own neglect.*  He says he did read the written part.  But the name of *Graves* was written, and he must have seen that his own name was inserted.") (emphasis added);

*DRS Precision Echo, Inc. v. Michigan Magnetics, Inc.*, 2003 WL 1141900, *9 (W.D. Mich. Jan. 7, 2003) (Quist, J.) (rejecting MMI's claim that it did not know that a certain building was covered by the agreement, "MMI's argument is rejected because it amounts to an ostrich defense. It is undisputed that Schedule 4(j) was included in the SPA, and that Schedule 4(j) contained explicit references to the 'extension' property.  *MMI's officers and attorneys . . . presumably read (or should have read) the entire SPA prior to signing it.*") (emphasis added);

misrepresentations [regarding the scope of an insurance contract] considering that Royal *could have read the policy*.  Royal did not appeal the trial court's decision in this regard . . . .") (emphasis added).

In short, Price's failure to obtain and read the CBAs does not support the notion that there was no meeting of the minds.  *See First Mercury Syndicate, Inc. v. Telephone Alarm Sys., Inc.*, 849 F. Supp. 559, 564 (W.D. Mich. 1994) (McKeague, J.) ("Under Michigan law, an insured is obligated to read his . . . policy . . . .  The insured is thus presumed to have read the policy and is held to knowledge of its terms and conditions.  *Proof of actual knowledge of, or of an actual 'meeting of the minds' on each provision . . . is not prerequisite to its enforcement.*") (emphasis added). Michigan common law obligated Price to read the letters of assent *and* the incorporated CBAs before signing; if he did not, he and Data are nonetheless charged with knowledge of the CBAs' terms and are bound by them.  "[W]here additional terms are made part of a written contract by reference, the parties are bound by those terms even if they have never seen them."  *Irwin Seating Co. v. IBM Corp.*, 2007 WL 2351007, *9 (W.D. Mich. Aug. 15, 2007) (Bell, C.J.) (citing, *inter alia, Ginsberg v. Myers*, 183 N.W. 749, 750 (Mich. 1921)).  *Cf. Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 283 (Mich. App. 2006) ("It is well established that an insured is obligated to read his . . . policy . . . .  Consistent with this obligation, if the insured has not read the policy, he or she is nevertheless charged with knowledge of the terms . . . .") (footnotes omitted), *app. denied*, 731 N.W.2d 746 (Mich. 2007); *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 42 n.82 (Mich. 2005) (""[A]n insured's failure to read his . . . contract has never been considered a valid defense.") (citations omitted).[5]

---

[5]

*Cf. Lark v. Detroit Edison Co.*, 297 N.W.2d 653, 655 (Mich. App. 1980) ("Edison

-20-

Finally, the court notes that a district court in our circuit has already applied these contract-law principles in a very similar context, i.e., against a party that signed a document incorporating a CBA and then later complained that it had not read the CBA.  In *Laborers Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702 (6th Cir. 1988) (per curiam) (Nelson, Boggs, D.J. Enslen), a general-contractors association and a laborers union had a CBA in effect from 1978-1980. In July 1979, the owner of Weinberger Homes signed a document binding his company to the 1978-80 CBA.  *Weinberger Homes*, 872 F.2d at 704.  A year later, in July 1980, the owner signed an interim document binding his company to the Supplemental 1980-82 CBA.  *Id.*  The 1980-1982 CBA contained a "roll-over" clause that extended the CBA for an additional two years (until 1984) unless one party or the other specifically disclaimed the extension.  *Id.*

Weinberger contended that it should not be bound by the 1980-82 CBA's rollover clause because it had never seen, let alone signed, that CBA.  *Weinberger Homes*, 872 F.2d at 105.  The district court disagreed and held that because Weinberger had signed the 1980 interim document which incorporated and bound it to the 1980-82 CBA, it was bound by the latter's rollover clause and therefore by the resultant 1982-84 CBA.  *Id.*  Because Weinberger failed to challenge this determination by the district court, our Circuit simply let that aspect of the district court's decision

---

consciously chose not to answer the summary judgment motions because it believed Reliance's insurance contract covered the accidents.  With diligence, Edison easily could have read the contract and discovered that the accidents were not covered . . . .  We will not equate this lack of due diligence with the mistake or excusable neglect required . . . for setting aside a judgment.");

*Beauchamp v. Great West Life Ass. Co.*, 918 F. Supp. 1091, 1098 (E.D. Mich. 1996) ("If plaintiff did not make herself aware of the ... scope of that clause, she did so at her own peril.");

stand without further comment.  *See id.*[6]  This part of the *Weinberger Homes*, therefore, is merely

a district court decision, not a holding by our Circuit.  While this court is not bound by the district

court's decision in *Weinberger Homes*,[7] *see Liebisch v. HHS*, 1994 WL 108957, *2 (6th Cir. Mar.

30, 1994) ("District court opinions have persuasive value only and are not binding as a matter of

law."), it finds the reasoning apposite and persuasive under the Michigan precedents discussed

above.  *Accord Operating Engineers Pension Fund v. Cecil Backhoe Serv., Inc.*, 795 F.2d 1501,

---

[6]

The Sixth Circuit panel wrote merely,

> Though Weinberger claims that he never received a copy of the 1980-82 agreement
> and thus, presumably, was not aware of the roll-over clause, the effect of such a roll-
> over clause or Weinberger's notice of the clause is a legal question not challenged
> by appellants.  Therefore, the judgment of the district court on the length of the
> contract term must stand.

*Weinberger Homes*, 872 F.2d at 105.  The Fund makes it seem that it was the Sixth Circuit, not
merely a district court, that issued the holding that the employer was bound to the incorporated CBA
even though the employer had not received or read it.  *See* Fund's Reply Br. at 6 ("The defendant
claimed that it should not be found bound to the entire term of the agreement because it had never
signed, nor even seen, the Supplemental Agreement containing the roll-over clause.  *The Court*
disagreed and found the defendant bound for the entire period.") (emphasis added).

The court assumes that this was an honest mistake, not an attempt to mischaracterize a non-
precedential district-court holding as a binding *circuit*-court holding.  *Cf. US v. Husted*, 558 F. Supp.
658, 660 (E.D. Mich. 1983) (remarking, in response to counsel's quotation from Sixth Circuit
opinion, "defendants' brief does not show that it was a quote from the district judge but leaves the
impression that it was a statement of a circuit judge").

[7]

*See, e.g., Paycom Billings Servs. v. Payment Resources Int'l*, 212 F. Supp.2d 732, 738 (W.D.
Mich. 2002) (Bell, C.J.) ("This court is not bound by a California district court opinion.");

*Hunter v. Lipps*, 2007 WL 2029043, *3 (S.D. Ohio July 10, 2007) ("This conclusion is also
supported by the district court's decision in *Garraway* . . . , which, although not binding on this
court, is persuasive.");

*Kirsch Co. v. Bliss & Laughlin Indus., Inc.*, 495 F. Supp. 488, 492 (W.D. Mich. 1980)
(Enslen, J.) ("[A] district court is . . . not bound by the decision of a district court . . . .").

1505 (9th Cir. 1986) ("Parties to collective bargaining agreements are conclusively presumed to have equal bargaining strength . . . .  A party who signs a contract is bound by its terms regardless of whether he reads it or considers the legal consequences of signing it.").

Therefore, if the letters of assent otherwise constitute a valid, enforceable contract, the fact that Price did not read the incorporated CBAs and fully understand their scope before he signed the letters, is no obstacle to enforcement of the letters.

Legal Standard: Oral Modification of a Written Contract under Michigan Law[8]

Michigan law holds that a written contract may be modified orally or in writing.  *Modern Living, LLC v. Wheatley*, 2007 WL 3170523, *2 (Mich. App. Oct. 30, 2007) (citing *Chatham Supermarkets, Inc. v. Ajax Asphalt Paving, Inc.*, 121 N.W.2d 836 (Mich. 1963)).  The modification must be by mutual consent.  *Modern Living*, 2007 WL 3170253 at *2 (citing *Adell Broadcasting Corp. v. Apex Media Sales, Inc.*, 708 N.W.2d 778 (Mich. App. 2005)).  "'The mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract.'"  *Modern Living*, 2007 WL 3170523 at *3 (quoting *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003)).

---

[8]

None of the three letters of assent that Price signed on behalf of Data contains a clause prohibiting oral modification or otherwise specifying how the parties may validly modify the letters.  In any event, in Michigan, even a written clause purporting to prohibit oral modification is not necessarily always conclusive.  The Michigan Supreme Court has held that "a party who seeks to prove that a written agreement prohibiting oral modifications was [itself] orally modified must prove by clear and convincing evidence 'that the parties mutually intended to modify the particular original contract, including its restrictive amendment clauses such as written modification or anti-waiver clauses."  *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003), *quoted by Bero Motors, Inc. v. GMC*, 743 N.W.2d 886, 888 (Mich. 2008) (Corrigan, J., dissenting on other grounds from denial of leave to appeal, joined by Markman, J.).

<u>Oral Modification of a Written Contract Governing ERISA / LMRA Employee Benefits</u>

However, this court is not free to apply Michigan common law, because the Sixth Circuit has held that LMRA and ERISA must be read to prohibit oral modification of a written agreement that expressly specifies the extent of an employer's obligation to make benefit contributions.

In *Central States S.E. and S.W. Areas Pension Fund v. Behnke, Inc.* ("*Behnke*"), 883 F.2d 454 (6th Cir. 1989). a trucking firm named Behnke, Inc. ("Behnke") was party to a series of written CBA negotiated between employers and local unions affiliated with the International Brotherhood of Teamsters ("the union"). *Id.* at 456. From 1950 to 1982, Behnke contributed to numerous employee-benefit funds as required by the CBAs. On March 31, 1982, the then-existing CBA expired and negotiations commenced for a new one. Meanwhile Behnke and the union executed a written Fringe Benefit Interim Agreement. Under the written agreement, Behnke was obligated to make certain contributions from April 1, 1982 through April 1, 1985 or the date that the new full CBA was executed (whichever was earlier). *Id.* at 456-57. Negotiations over a new full CBA dragged on, and Behnke expressed concern about the rising cost of health-care benefits. *Id.* at 457.

In late 1982, Behnke and the union orally agreed on a new CBA, which was never reduced to writing. This 1982 oral CBA specified how much more Behnke would pay in 1983-84 and 1984-85 for healthcare insurance premiums and for wages. *Behnke*, 883 F.2d at 457.

In June 1983, Behnke and the union executed a *written* Participation Agreement that specified Behnke's 1982-83 and 1983-84 healthcare-insurance contribution rates. The PA provided that for 1984-85, Behnke's rate would be "whatever rate was necessary to maintain the plan." *Behnke*, 883 F.2d at 457. The PA also bound Behnke to the Central States Trust Agreement, which obligated Behnke to contribute at the rates specified in the applicable CBA while negotiations

-24-

continued towards a new CBA.  *Id.*  Accordingly, Behnke contributed to the union's trust fund, and the union paid benefits to Behnke out of that fund through April 1984.  *Id.*

In April 1984, Behnke contacted the union regarding healthcare benefits for 1984-85.  A union representative incorrectly told Behnke that he would be required to pay an amount that was higher than that called for by the oral CBA.  Without the union's consent, Behnke switched to a healthcare insurance carrier which offered lower premiums than the carrier that Behnke had been using (and which the union preferred to continue using).  *Behnke*, 883 F.2d at 457.  In May 1984, Behnke notified the union that he was discontinuing contributions to its trust fund because its medical carrier's premiums were too high; the union responded by suspending benefits and payments to Behnke's employees out of that fund.  *Id.* at 457-48.  (Behnke proceeded to maintain a comparable health and welfare benefits policy by directly paying the carrier that he preferred.  *Id.* at 458.)

The union sued Behnke under ERISA and LMRA to recover delinquent employee pension, healthcare, and welfare contributions for April 1984 through November 1985, and the district court entered judgment for the union.  *Behnke*, 883 F.2d at 458.  The Sixth Circuit affirmed, holding:

> Behnke's claims hinge on the effect, under ERISA, of the 1982-85 oral CBA between Behnke and the Union because the terms of the employee benefit plan under the oral CBA conflict with the explicit written terms of the plan under the Interim, Participation, and Trust Agreements.  That is, the oral CBA gave Behnke the option to change carriers in years two and three, while the written agreements commit Behnke to continu[ing] its contributions to Central States during, and potentially beyond, those years.  The district court concluded that the written agreements determined the duration of Behnke's obligation to contribute to Central States and that, to the extent that the oral CBA limited that obligation, the oral CBA violated national policy and was legally unenforceable.
>
> * * *
>
> The problem with Behnke's reliance on the oral CBA regarding its obligation to make contributions to Central States, however, is that the LMRA and ERISA require employer contributions to trust funds on behalf of employees to be pursuant to

detailed *written* agreements specifying the employer's duty to contribute. *See McHugh v. Teamsters Pension Trust Fund*, 638 F. Supp. 1036 (E.D. Pa. 1986) (Fund trustees not bound by alleged oral understandings between union and management; employee benefit plan agreements, by law, must be written[,] and oral modifications or supplementations are invalid) (citing ERISA, 29 U.S.C. § 1102(a)(1), and LMRA 29 U.S.C. § 186(c)(5)(B)); *Straub v. Western Union Tel. Co.*, 851 F.2d 1262 (10th Cir. 1988) (ERISA precludes oral modification).

Accordingly, but for the other written agreements between Behnke and the Union, the provisions of the oral CBA providing for payments to Central States in year one and again, following negotiations with employees, in year two while reserving the right to negotiate the logistics and carrier for future (third-year) health and welfare payments, would be unenforceable as written and in violation of the LMRA and ERISA.

*Behnke*, 883 F.2d at 458, 459-60.[9]  *See, e.g., Board of Trustees of Ohio Carpenters Pension Fund*

*v. Kovco Carpentry*, 2006 WL 3742266, *2-3 (N.D. Ohio Dec. 15, 2006) (employer Kovco argued

"that it does not *now* owe those amounts because a union representative allegedly made some sort

of oral agreement with Kovco, an agreement which did not comport with the express terms of the

_____

[9]

Even if the court were free to apply Michigan common law governing oral modifications of a written contract, the union business manager's alleged oral assurance still might not affect a modification of the letters of assent.

Price alleges that his decision to sign the letters of assent was made in reliance on the manager's oral assurance that Data would not *really* be required to pay the benefits required by the CBAs until Data "got on its feet" – at least until the end of 2004 – and could afford it. *See* Opp'n at 8 ("Data signed the Letters of Assent *based on the agreement with Local 665* . . . .") (emphasis added). Therefore, according to defendants' version of events, the manager must have made that oral assurance *before* Price signed the letters. In Michigan, "parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, are not admissible to vary the terms of a contract which is clear and unambiguous." *Hamade v. Sunoco, Inc.*, 721 N.W.2d 233, 247 (Mich. App.) (quoting *UAW-GM HR Ctr. v. KSL Rec. Corp.*, 579 N.W.2d 411 (Mich. App. 1998) (citation and brackets omitted), *app. denied*, 722 N.W.2d 808 (Mich. 2006).

To use the pre-contract oral assurance as a basis for escaping Data's CBA obligations, then, defendants would have to show that an exception to the parol evidence rule applies. *See Hamade*, 721 N.W.2d at 248 (describing exceptions as related by *NAG Enters., Inc. v. All State Indus., Inc.*, 285 N.W.2d 770 (Mich. 1979)). The court need not address this issue because, as discussed above, federal ERISA/LMRA case law displaces Michigan contract law on this issue.

-26-

CBA. * * * Of course, no union representative would have the authority to modify the terms of the CBA.") (citing *Behnke*, 883 F.2d at 459).

The rule prohibiting reliance on or enforcement of oral agreements that vary the benefit provisions of a written CBA can also work against an employee. For example, in *Robbins v. Int'l Bthd. of Teamsters*, 2006 WL 1752388 (W.D. Mich. June 23, 2006) (Miles, J.), a union local permitted Robbins to be an active, dues-paying member, and the employer agreed to make pension contributions to the plaintiff Fund on his behalf. *Id.* at *3. Both the employer and the union local told Robbins that he was entitled to participate in the pension plan by virtue of his membership in the local. *Id.* at *4. The Trustees of the pension fund, however, ultimately determined that during the period August 1993 through July 1998, Robbins was primarily employed as a mechanic, not a driver, and so was not eligible for pension fund participation under the express terms of the CBA. *Id.* at *2. When Robbins died, the amounts paid to his wife did not reflect the pension-fund contributions that the employer had made on his account during the contested five-year period, and Robbins' wife sued the pension fund under ERISA to recover the additional pension amount. *Id.* at *1-2. Judge Miles of this court upheld the pension fund's determination. Following *Behnke*, as well as persuasive authorities from other circuits, Judge Miles explained why Robbins' wife could not compel the payment of the additional pension benefits even if both the fund and her late husband's employer wished her to receive them:

> Section 515 of ERISA provides,
>
>> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement *shall*, to the extent not inconsistent with law, *make such contributions in accordance with the terms and conditions of such plan or such agreement.*

-27-

29 U.S.C. § 1145 (emphasis added).  Section 515 binds the parties to a collective bargaining agreement to the terms of the agreement regardless of their undisclosed intent or understandings. . . . *Behnke* 883 F.2d [at] 463 (where plan had never been apprised of agreement between employer and the union, it was entitled to assume that employer was following the stated terms of the written plan); *Bakery & Confectionery Union v. New World Pasta*, 309 F. Supp.2d 716, 723-24 (D. Md. 2004) (citing *Bakery & Confectionery Union v. Ralph's Grocery Store*, 118 F.3d 1018, 1021 (4th Cir. 1997)).

In addition, ERISA imposes a fiduciary duty on plan administrators to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]."  29 U.S.C. § 1104(a)(1)(D).

Thus, under ERISA, undisclosed "side agreements" that deviate from the terms and conditions of a plan or [CBA] are not binding upon the trustees of the plan.  *Central States, S.E. & S.W. Areas v. Transport, Inc.*, 183 F.3d 623 (7th Cir. 1999) (finding that under ERISA the employer was bound by the terms of a [CBA], despite a second agreement between the employer and the union altering the terms of the [CBA]); *McGowan v. NJR Service Corp.*, 423 F.3d 341, 245-46 (3rd Cir. 2005) (explaining that the statute dictates that the rights of the parties are governed by the documents on file with the Plan, and not by outside private agreements between beneficiaries and participants).

No matter how well-meaning their motivation, [employer] Yerington and Local 7 could not bind the Defendant pension fund to treat Mr. Robbins as a "special case" and permit him to be covered by the [CBA] when he would not otherwise qualify under the terms of the plan.  *See Egelhoff v. Egelhoff ex rel. Breimer* 532 U.S. 141, 147 (2001) (noting the statutory command of § 1104(a)(1)(D) that an ERISA fiduciary must administer the plan "in accordance with the documents and instruments governing the plan").

*Robbins*, 2006 WL 1752388 at *5 (paragraph breaks added).

In any event, whether the rule announced in *Behnke* benefits employee, employer, or union trust fund in a given case, this court is obliged to follow the rule.  As a matter of law under *Behnke*, the parties here could not orally modify the letters of assent so as to eliminate, reduce, or vary Data's obligation to pay the benefits expressly guaranteed by the written CBAs.  *See, e.g.,* citing *Behnke*: *Trustees for the UP Plumbers' & Pipefitters' Health & Welfare Fund v. Frazer*, 2006 WL 1008992,

*5 (W.D. Mich. Apr. 13, 2006) (Greeley, M.J.) ("A union representative's oral modifications to the terms of a [CBA] may not be relied upon or enforced by an employer."). [10]

<u>Has the Fund Waived its Right to Demand Data's Performance under the CBAs?</u>
<u>Should the Fund Be Estopped from Demanding Data's Performance under the CBAs?</u>

Alternatively, the defendants contend that even if the alleged oral assurance did not validly modify the written contract, the fund waived its right to demand benefit contributions by failing to demand such payment for over two years. *See* Defs.' Opp'n at 9 (quoting *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 260 (Mich. 2003) ("[W]hen a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied.")).

Similarly, the defendants contend that even if the alleged oral assurance of the local's business manager did not validly modify the written contract, the assurance should equitably estop

---

[10]

*Accord Maxwell v. Lucky Const.*, 710 F.2d 1395, 1398 (9th Cir. 1983) ("Were we to initiate a system of case by case judicial review of oral modifications [of agreements covered by ERISA or LMRA], we would render the protective writing requirement less effective by exposing both union and employer to corrupt[-]bargain temptation.");

*Bd. of Trustees of the Ohio Laborers Fringe Benefit Programs*, 2005 WL 1705173, *4 (S.D. Ohio July 20, 2005) (Kemp, U.S.M.J.) ("In support of their position that they are not required to make fringe-benefit contributions for non-union employees, Defendants claim that union representatives told Mr. Lombardi [employer's officer who signed agreement] that he was not required to have each of his employees who was hired to perform work within the trade jurisdiction of the union join the union within eight days of hire. Although the record reflects some dispute as to whether Mr. Lombardi was told this . . . it is not material because ERISA precludes oral modification of agreements.");

*Trustees of the Plumbers & Steamfitters Local Union No. 43 Health & Welfare Fund v. Crawford*, 2007 WL 4481440, *9-10 (E.D. Ky. Dec. 18, 2007) (Collier, C.J.) ("Fund administrators may rely on the unambiguous terms of the writing. Oral agreements are not permitted.") (citing *Behnke* and *N.W. Ohio Admin'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1024 (6th Cir. 2001)).

them from demanding compliance with the CBA's benefit provisions.  The defendants argue that

> Local 665, through Patrick, induced Price into signing the Letters of Assent by promising that Data would not be obligated to pay union scale wages or fringe benefit contributions until data "got on its feet."  Based on that promise, Price signed the Assent Agreements.  Price and Glanz relied no that promise, and decided to close Data when it became clear that Data could not get "on its feet." * * *

> With no known outstanding debts, Price and Glanz shut Data down and chose to start a new company.  Had Price and Glanz known that Plaintiffs would attempt to ignore the terms of their [oral] deal with Data and seek payment of fringes on Data's old work, Price and Glanz may have chosen to seek employment with another company instead of continuing Data or forming Telecom after Data ceased operations.  Starting a new company that Plaintiffs would drag into this dispute would not have been their choice.  Plaintiffs should now be estopped from seeking payment from any of the Defendants.

> * * *

> In reliance on this promise, the officers of Data decided to close down Data <u>prior</u> to any contributions being due to Plaintiffs or demanded by Plaintiffs.  In further reliance, Price, Glanz, and Gloria Price formed a new company, Telecom, without any suggestion that Plaintiffs would seek payment from either Data, Telecom, or themselves individually. * * * Justice requires that Plaintiffs be estopped from going back on their promise to Defendants.

Defs.' Opp'n at 22-23.

In response to the defendants' waiver and estoppel arguments, the Fund relies on Sixth

Circuit published precedent applying ERISA section 515.  That section provides,

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  As our Circuit has explained,

> Congress has enacted Section 515 in order to permit multiemployer plans to rely upon the terms of the collective bargaining agreements and plans as written, thus permit[ting] trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law. * * * The fund thus stands much like a holder in due course in commercial law who is entitled to enforce the writing without regard to understandings or defenses applicable to the original parties.

-30-

*Bakery and Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery of Ohio*, 133 F.3d 955, 959 (6th Cir. 1998). *See, e.g., Pipefitters Local 636 Defined Pension Benefit Fund v. L&R Servs., Inc.*, 2007 WL 1814680, *6 (E.D. Mich. June 20, 2007) (in an action to recover delinquent fringe-benefit contributions that employers owed under a CBA, the employers "as a matter of law" could not raise fraud in the inducement or fraud in the execution of the document by which they agreed to be bound by the CBAs) (citing *Behnke*, 883 F.3d at 460).

In the earlier decision which held that parties may not orally modify an employer's ERISA/LMRA benefit obligations, our Circuit explained why an employer may not invoke any state-law contract or equitable defenses to avoid such obligations either:

> The contribution and payout amounts and systems are predicated on the trust's receipt of full payment on behalf of covered employees, *Robbins v. Lynch*, 836 F.2d 330 (7th Cir. 1988). In *Lynch*, the Seventh Circuit explained why trust funds are entitled to enforce employers' written obligations to contribute notwithstanding an employer's proffered defense to that contractual obligation:
>
> > Funds must assume that all participants in a plan are following the stated terms; no other approach permits accurate actuarial computations and proper decisions about which claims to pay. Just as the Federal Deposit Insurance Corp. is not bound by undisclosed promises of insured banks, so pension funds get the benefit of the written terms of agreements. Section 1145 of ERISA requires employers to make all pension contributions "not inconsistent with law". This language was added to ERISA "to simplify delinquency collection" by freeing pension and welfare funds from defenses that pertain to the unions' conduct. A claim that the union has promised not to collect a payment called for by the agreement is not a good answer to the trustees' suit – although it might be a ground on which to obtain damages from the local union.
>
> *Id.* at 333-34 (citations omitted). Moreover, in the recent case of *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir. 1989), the *en banc* court elaborated on why otherwise valid defenses to contract formation, such as fraud in the inducement, oral promises not to enforce written agreements, etc., cannot cut off the fund's claims:

-31-

> Multi-employer pension and welfare plans would be in a bind if . . . flaws in the formation cut off third-party claims.  Plans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits.  Multi-employer plans are defined-contribution in, defined-benefit out.  Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize – perhaps because they employers go broke, perhaps because they are deadbeats, perhaps because they have a defense to the formation of the contract.  If some employers do not pay, others must make up the difference in higher contributions, or the workers will receive less than was promised.  *Lynch*, 836 F.2d at 333.
>
> Costs of tracking down reneging employers and litigating also come out of money available to pay benefits.  The more complex the litigation, the more the plan must spend.  Litigation involving conversations between employers and local union officials – conversations to which plans are not privy – may be especially costly, and hold out especially great prospects of coming away empty-handed . . . .

> *Id.* at 1151.

*Behnke*, 883 F.2d at 460-61.

Accordingly, the court holds that the defendants may not use the doctrines of waiver and estoppel, or any other state-law defenses to contract formation or enforcement that might otherwise apply, to avoid compliance with its audit, reporting, and benefit payment obligations under the CBAs that were incorporated into the letters of assent.  *See, e.g., Trustees of BAC Local 32 Ins. Fund v. Caloia*, 261 F. Supp.2d 814, 820 (E.D. Mich. 2003) (granting summary judgment to plaintiff multiemployer plans in ERISA action to recover delinquent benefit contributions and to compel further audits to ascertain additional liabilities; "That there may have been an oral agreement which purported to limit the applicability of the CBA is of no consequence.  Thus, [employer]'s promissory estoppel claim fails.").

**There Is No Genuine Issue as to the Amount Owed for Oct. 2003 - Dec. 2004**

The defendants have not meaningfully disputed the accuracy of the audit that was conducted by the Fund and summarized in its December 21, 2006 post-audit letter, reproduced at MSJ, Ex. C, whether by identifying conceptual defects in its techniques or errors in its calculations.

Accordingly, the court determines that there is no genuine issue as to whether Data owes at least $57,882.84 in unpaid benefit contributions for the period October 2003 through December 2004: it does.  (That amount does not account for any additional late-payment charges or interest required by the CBA or by statute and accruing after the date of said audit, nor does it include any costs and attorney fees to which the Fund may be entitled.)

**No Genuine Issue:  Data & Telecom Were Alter Egos / Single Enterprise**

The Fund contends that Data and the later-formed company, Telecom, were alter egos of one another.  Similarly, to the extent that Data and Telecom existed simultaneously for any period of time, the Fund contends that they constitute a "double-breasted" operation, i.e., that they were actually a single employer although nominally separate.  *See Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 587 n.12 (6th Cir.) ("'Increasingly, the term [alter ego] also is applied to so-called double-breasted operations to determine whether two or more coexisting employers performing the same work are in fact one business, separated only in form.'") (quoting *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990)), *cert. denied*, – U.S. – & –, 127 S.Ct. 554 & 555 (2006).  The similarities between Data and Telecom were certainly not, as the defendants assert it, "superficial."  *See* Opp'n at 12.

Preliminarily, it is federal common law, not Michigan common law, which governs the alter ego determination in an ERISA dispute.[11]  As our Circuit has held,

---

[11]

*Cf. US v. Cordova Chem. Co. of Michigan*, 113 F.3d 572, 583-84 (6th Cir. 1997) (*en banc*)

> "[w]hether a company or individual is responsible for the financial obligations of another company or individuals is a question of federal law when it arises in the context of a federal labor dispute.  Although state law cases may provide guidance in fashioning the content of federal law, they are not binding and thus do not control" the analysis.

*Yolton*, 435 F.3d at 586 (quoting *NLRB v. Fullerton Transfer & Storage, Ltd., Inc.*, 910 F.2d 331, 335 (6th Cir. 1990) ("*Fullerton*") and applying federal common law in ERISA dispute).

Therefore, the court disregards the defendants' citation of authority for the proposition that "[t]he general principle *in Michigan* is that separate corporate identities will be respected, and thus corporate veils will be pierced only to prevent fraud or injustice."  *See* Opp'n at 11 (quoting *In re RCS Engineered Prods. Co., Inc.*, 102 F.3d 223 (6th Cir. 1996)) (emphasis added).  The defendants' reliance on *Nogueras v. Maisel & Assocs. of Michigan*, 369 N.W.2d 492 (Mich. App. 1985) is likewise unavailing, because it reflects Michigan rather than federal common law.  *See* Opp'n at 11 (citing *Nogueras* for the Michigan common-law rule that alter ego status will not be found unless the corporate entity was used to commit a fraud or wrong).

Under *federal* common law, a successor corporation generally is not liable for its predecessor's liabilities unless it has expressly assumed them.  *Yolton*, 435 F.3d at 586 (citing *NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 279 (1972)).  This rule is not absolute, however, as the Supreme Court cautions that a CBA might remain in force to bind a successor "'in a variety of circumstances involving a merger, stock acquisition, *reorganization* or assets purchase.'"  *Yolton*,

---

(Kennedy, J., joined by Milburn, Nelson, Boggs, Siler, & Batchelder, JJ.) ("Whether the circumstances in this case warrant the piercing of the corporate veil will be determined by state law.") *with id.* at 583-84 (Merritt, J., concurring in part & dissenting) (arguing that federal common law should govern the corporate-veil issue in CERCLA context))).  *See generally US v. Bestfoods*, 524 U.S. 51, 66 n.9 (1998) ("There is significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing.") (citing, *inter alia*, *Cordova Chem. Co.*).

435 F.3d at 586 (quoting *Burns*, 406 U.S. at 291) (emphasis added).

The alter ego doctrine was created to prevent employers from evading obligations under ERISA and LMRA by merely altering their corporate form. *Yolton*, 436 F.3d at 587 (citing *NLRB v. Allcoast Transfer, Inc.*, 780 F.3d 576, 579 (6th Cir. 1986) ("*Allcoast*")). The doctrine is most commonly used in labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is "'merely a disguised continuance of the old employer.'" *Yolton*, 435 F.3d at 586-87 (quoting *Fullerton*, 780 F.3d at 336 (quoting *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942))). To determine alter ego status in this situation, the court asks "'whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision, and ownership.'" *Yolton*, 435 F.3d at 587 (quoting *Fullerton*, 910 F.3d at 336 (quoting *Nelson Electric v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)). No one of these factors is controlling; rather, the analysis is "flexible,", the court evaluates all the relevant factors together, and the court can find alter ego status even if not all of them are present. *Yolton*, 435 F.3d at 587 (citing *J.M. Tanaka Const., Inc. v. NLRB*, 625 F.2d 1029, 1033 (9th Cir. 1982) and *Allcoast*, 780 F.2d at 582).[12]

Significantly, despite the origin of the alter ego doctrine, *"'even when a reorganization is supported by legitimate reasons*, the employer may be prevented from avoiding its prior labor obligations.'" *Yolton*, 435 F.3d at 587 n.14 (quoting *Allcoast*, 780 F.2d at 582) (emphasis added).

---

[12]

*See, e.g., Cement Masons' Pension Trust Fund - Detroit & Vicinity*, 2006 WL 770444, *6 (E.D. Mich. Mar. 24, 2006) (finding that companies were not alter egos where they "have different ownership, different offices, different phone numbers, different officers, and different management – and they do different work. The two companies maintain separate bank accounts, separate insurance policies, and do not share common equipment. Further, there is no evidence of intermingling of funds or assets.").

Our Circuit has expressly "rejected [the notion] that the alter ego doctrine 'applies only to situations in which a change in the corporate form allows an employer to evade collective bargaining obligations, and that . . . *evidence of an intent to evade labor agreements [is] essential to an alter ego claim.*'" *Yolton*, 435 F.3d at 587 (quoting *Wilson v. Int'l Bhd. of Teamsters*, 83 F.3d 747, 758-59 (6th Cir. 1996)). Rather, our Circuit "has made clear that 'common ownership or an intent to evade labor law obligations are not prerequisites to a finding of alter ego status.'" *Yolton*, 435 F.3d at 587 (quoting *Wilson*, 83 F.3d at 759); *see also Allcoast*, 780 F.2d at 579 (in the alter ego analysis, "[n]o factor is controlling and all need not be present").[13]

_____

[13]

As Judge Victoria Roberts recently noted,

Examination of Sixth Circuit precedent reveals a potential conflict between the holdings of two panels. In 1986 the sixth Circuit in *Allcoast* held that intent [to evade CBA / ERISA obligations] is *not* a dispositive factor in the alter ego analysis. Subsequently, in [*Trustees of the*] *Resilient Floor Decorators Insurance Fund v. A & M Installations, Inc.*, the Sixth Circuit held facts could not support a finding of alter ego liability if there was "an intent to evade" because it was "clearly the focus of the alter ego doctrine." . . . 395 F.3d 244, 248 (6th Cir. 2005).

*Trustees of the Painters Union Deposit Fund v. Interior/Exterior Specialist Co.*, 2008 WL 724355, *14 (E.D. Mich. Mar. 18, 2008). Judge Roberts cogently explains her view that *Resilient*'s "intent holding cannot directly apply" where, as here, a non-union company is formed after a union company. *See id.* at *14-15.

In any event, this court need not decide whether *Resilience* conflicts with *Allcoast*, or whether *Resilience* applies in cases where a non-union company is formed after a union company. To the extent that *Resilience* conflicts with *Allcoast*, this court must follow *Allcoast* because it was issued first. *See US v. Tate*, 516 F.3d 459, 467 (6th Cir. 2008) ("'[W]hen a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case.'") (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001)). *See, e.g., Asmo v. Keane*, 471 F.3d 588, 600 (6th Cir. 2006) (Griffin, J., dissenting o.g.) ("To the extent that *Nguyen* and *DiCarlo* could be read to state [such] a holding. . . , they conflict with, and must yield to, earlier published decisions.") (quoting *US v. Yoon*, 398 F.3d 802, 806 (6th Cir. 2005) ("The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.")).

-36-

Therefore, the court "need not look for evidence of [Telecom]'s intent to evade any labor obligations in determining whether it remains liable under the CBAs as the alter ego to [Data.]." *Yolton*, 435 F.3d at 588.  ("However, if a showing can be made that an employer intended to circumvent its labor obligations, it lends considerable support to an alter ego finding." *Trustees of the Painters Union Deposit Fund v. Interior/Exterior Specialist Co.*, 2008 WL 724355, *14 (E.D. Mich. Mar. 18, 2008) (citing *NLRB v. Crossroads Elec., Inc.*, 178 F. App'x 528, 534 (6th Cir. 2006) (citing *Allcoast*, 780 F.2d at 581, and *Fullerton*, 910 F.2d at 337)).  The essential inquiry under an alter ego analysis is only whether there was a *bona fide* discontinuance and a true change of ownership . . . or merely a disguised continuance of the old employer.'" *Yolton* 435 F.3d at 588 (quoting *Allcoast Transfer*, 780 F.2d at 579 (quoting *Southport Petroleum*, 315 U.S. at 106)).

Under the somewhat "relaxed" alter ego standard that pertains to federal labor-law disputes,[14] the court finds that Telecom was merely a disguised continuance of Data, i.e., that Telecom was the alter ego of Data.  Likewise, the court finds that during any period when the two companies functioned simultaneously, Telecom and Data constituted a single employer or integrated enterprise with a "double-breasted" operation.

Price testified that three of Data's four shareholders  – the three largest shareholders – went on to become shareholder-owners in Telecom.  Price also testified that all three of the former Data's

---

[14]

*See Hamilton v. Carrell*, 243 F.3d 992, 1004 (6th Cir. 2001) ("In determining whether to disregard the corporate form, we must consider the importance of the use of that form in the federal statutory scheme, an inquiry that *generally gives less deference to the corporate form than does the strict alter ego doctrine of state law.*  Courts have without difficult disregarded form for substance where ERISA's effectiveness would otherwise be undermined.") (citation omitted, emphasis added);

*Corrigan v. USX Corp.*, 2005 WL 2621981, *9 (N.D. Ohio Oct. 14, 2005) ("[A]pplication of the more relaxed alter ego standard is appropriate only when ERISA or another federal statute is at the center of the litigation."), *aff'd*, 478 F.3d 718 (6th Cir. 2007).

officers became officers of Telecom.

> Q.    Is the only difference between Data and Telecom that Data was a union contractor and Telecom was not?
> A.    No.
>
> Q.    What are the other differences?
> A.    Change in officers and ownership.
>
> Q.    Who were the owners of Data?
> A.    Myself, Kevin Glanz, Gloria Price, and Mike Hayes.
>
> &ast; &ast; &ast;
>
> Q.    Were all four of those persons shareholders in Data?
> A.    Yes.
>
> Q.    Were all four of those persons officers of Data?
> A.    I don't believe so.
>
> Q.    Who wasn't an officer of Data?
> A.    Mike Hayes.
>
> &ast; &ast; &ast;
>
> Q.    Okay.  Now how about Telecom, who were shareholders of Telecom?
> A.    Myself, Kevin Glanz, Gloria Price.
>
> Q.    And who were officers of Telecom?
> A.    The same three.
>
> Q.    Okay.  So the only difference between the two companies was that Mr. Hayes was no longer involved in Telecom?
> A.    The amount [sic] of shares owned by the officers also changed.
>
> Q.    Okay.  So the identity of the shareholders and the number of total shares owned by the shareholders was different for Telecom than it was for Data?
> A.    Correct.

MSJ Ex. B at 6:5 to 7:9.  Price emphasizes differences in ownership and officer identity between

Data and Telecom, but the court finds that in the context of the great overlap in ownership and

operations discussed below, the differences in officers and ownership are not sufficient to

distinguish the companies for purposes of the alter ego analysis:

<u>Data</u>                                        Telecom

-38-

| President | James K. Price | James K. Price |
| Vice-President | Gloria Price | Kevin Glanz |
| Secretary | Kevin Glanz | Gloria Price |
| Treasurer | Michael Hayes | Gloria Price |

MSJ Ex. D (Data's Articles of Incorporation) and Ex. E (Telecom's Articles of Incorporation). Price was president of both Data and Telecom, his wife and Glanz merely switched places as Vice-President and Secretary, and his wife also assumed the Treasurer's position formerly held by Hayes – the only shareholder of Data who did not continue as shareholder of Telecom. Not one new individual entered the equation as a shareholder of Telecom who had not owned shares in Data, and not one new individual entered the equation who had not served as an officer of Data. *Contrast Roofers Local 149 Security Trust Fund v. Duane Smelser Roofing Co.*, 285 F. Supp.2d 936, 940-42 (E.D. Mich. 2003) (defendant corporations showed a genuine issue as to whether they were alter egos; "The ownership factor heavily favors Defendant . . . . The ownership interests of Defendant David Smelser Roofing Company and Defendant Duane Smelser Roofing Company do not overlap . . . .").

As for the location and control of Data and Telecom, the two companies had the same registered address, 10442 Hartel in Grand Ledge, Michigan, zip code 48837; the same registered agent, James Price; and the same incorporator, again James Price. *See* MSJ Ex. D (Data's Articles of Incorporation, Art. IV, ¶¶ 1-2 and Art. V) and Ex. E (Telecom's Articles of Incorporation, Art. IV, ¶¶ 1-2 and Art. V). Moreover, although Glanz and the Prices rearranged their ownership shares during the transition from Data to Telecom, both companies remained *95%* owned by these same three people. Similarly, both companies were majority-owned by the husband-and-wife couple of James and Gloria Price (Data 60% and Telecom 80%). It is appropriate to note the ownership of the Prices together, as even the Internal Revenue corporate-ownership form required by 26 U.S.C.

-39-

§ 1362 provides, in section J, "A husband and wife (and their estates) are counted as one shareholder in determining the number of shareholders without regard to the manner in which the stock is owned."  MSJ Ex. D at 7 (Data's Form 2553, "Election by a Small Business Corporation" signed Sept. 5 and Sept. 9, 2003) and Ex. E at 7 (Telecom's Form 2553, "Election by a Small Business Corporation" signed Dec. 29, 2004).

|                    | Data          | Telecom    |
|--------------------|---------------|------------|
| James K. Price, Jr. | 6,000 shares  | 750 shares |
| Gloria Price       | 30,000 shares | 50 shares  |
| Kevin Glanz        | 20,400 shares | 200 shares |
| Michael F. Hayes   | 3,000 shares  | -----      |

*Id.*[15]  Michael Hayes' departure from the ownership during the transition from Data to Telecom changed the remaining owners' share of the enterprise by only 5%.

The nature of the two enterprises, the identity of their non-owner personnel, and their day-to-day operations also weigh in favor of an alter ego finding.  The defendants do not dispute that Data and Telecom were both electrical contractors operating in the same geographical area; they do not attempt to distinguish between the types of electrical work done or the types of customers served by the two entities.  The defendants downplay the significance of this similarity.  The court agrees that by itself such a general similarity is not nearly enough for an alter ego finding, but it is relevant and consistent with the premise that they were alter egos.  *Contrast Roofers Local 149 Security Benefit Trust Fund v. Milbrand Roofing Group, Inc.*, 2008 WL 53710, *3 (E.D. Mich. Jan. 3, 2008) (O'Meara, J.) (genuine issue existed as to whether companies were alter egos where, *inter alia* "MRC did commercial hot tar roofing.  JKM does shingling only, primarily for the residential

---

[15]

Data and Telecom also designated the same legal representative for purposes of communication with the IRS, though the court does not place much weight on that factor.  *Id.* § F.

-40-

market.  Although plaintiffs contend that both companies do 'commercial roofing,' the record does not support a finding that the business and purpose of these entities was substantially identical.").

The defendants admit that Data's vehicles, equipment, and tools simply became Telecom's vehicles, equipment, and tools, right down to the computer, fax machine, and office supplies.  The defendants also admit that, until about July 2007 (twenty-five months after Data's dissolution), Telecom used the same telephone number (Glanz's cellular phone) and the same facsimile numbers as Data had.  *See* MSJ Ex B at 17:2 to 19:6 (vehicles and tools); *id.* at 24:19 to 25:25 (phone and fax numbers); *id.* at 26:22 to 27:20 (office equipment/supplies).  *Cf. Plumbers Local No. 98 Defined Benefit Pension Fund v. Premier Pluming & Mechanical, LLC*, 2006 WL 2623370, * (E.D. Mich. Aug. 11, 2006) (finding that City Pride Plumbing was the alter ego of Premier Plumbing, partly based on the fact that "City Pride did not own any equipment and instead used Premier's equipment").

The defendants emphasize that the Data/Telecom office was merely the Prices' home, for which Data/Telecom paid no rent; that the Data/Telecom telephone was Glanz's "personal" cell phone; and that the office supplies and furniture were merely the Prices' household furniture and computers, not items purchased by Data or Telecom.  *See* Defs.' Opp'n at 12-13.  But this does not change the fact that the two entities used the same office equipment, supplies, telephone line, facsimile line, etc.  The fact that two companies did not pay for the use of common office equipment and telecommunications has no bearing on whether they were alter egos.

Price testified that one of Telecom's three vans had not been owned by Data, but Telecom did not purchase it until about December 2007 (thirty months after Data's dissolution).  *See* MSJ Ex B (Price Dep) at 26:14-21; *see also id.* at 26:7-12 (at unspecified times, Telecom purchased screw-

-41-

guns, saw-zaws [sic], and hand tools that had not been owned by Data).  In other words, for about

two and a half years after Data's dissolution, both of Telecom's vans were vans that it inherited from

Data.  The defendants emphasize that one of the vans that passed from Data to Telecom had a

market value lower than the amount of the vehicle loan,[16] and the court must accept this allegation

as true for purposes of this motion.  But it does not change the fact that Telecom's inheritance of

Data's vehicles is consistent with the premise that they are alter egos.

    Further, the plaintiffs submit undisputed evidence that Data and Telecom had at least one

common material supplier, Kendall Electric, Inc., of Lansing, Michigan.  Kendall sent an invoice

to Data on May 4, 2005 and an invoice to Telecom on May 9, 2005; a comparison of the invoices

shows that they bear the same order date (May 4, 2005, about a month before Data's official

dissolution), the same invoice number S2582168.001, and the same total amount due ($2,902.82).

*See* MSJ Ex G; *see also generally* MSJ Ex B (Price Dep) at 62:9 to 64:24 (Price concedes that

Telecom "possibly" paid some of Data's debts).  At least in the instance of this order from Kendall,

one must conclude that Data and Telecom were the same entity, or that Telecom assumed Data's

---

    [16]

    "The 2003 van previously owned by Glanz and then Data was later used by Telecom. Telecom assumed the loan obligation for this vehicle.  No payment was made to Data for the 2003 van because the amount owed at the time of transfer exceeded the market value of the vehicle. Assumption of the loan was the consideration."  Defs.' Opp'n at 14, citing Opp'n Ex A (Price Aff.) ¶ 22 and Ex B (Price Dep) at 48.  The defendants seem to imply that Telecom did not benefit from the transfer of this van from Data ownership to Telecom ownership.  It is not clear that this accurate, as the availability of Data's used van obviated the need for Telecom to use any of its funds for a downpayment on another vehicle, to buy a newer and more costly vehicle, or to apply for credit for the purchase of another vehicle.  Absent evidence, it is not obvious that Telecom would have been able to find another vehicle-owner willing to part with a suitable vehicle with no compensation other than its assumption of the vehicle's loan.

    In any event, the defendants do not explain how this question – whether or not the passage of the van from Data to Telecom conferred a tangible or quantifiable benefit on Telecom – is material to the plaintiffs' claims.

debts and relationship with this supplier.

On the other side of the ledger, the defendants do not identify any suppliers that were used by one company but not the other. They reason that this is "of no consequence as there are only a handful in the Lansing area from which to choose", Opp'n at 12. Because the defendants are opposing summary judgment, the court must accept as true their allegation that there are few electrical suppliers in the Lansing area suitable for the needs of contractors such as Data and Telecom. Accordingly, the court places only slight weight on the fact that Data and Telecom both used Kendall Electric as a supplier. The court finds it quite significant, however, that Telecom permitted Kendall to bill it for supplies ordered by Data; Price testified that Telecom "possibly" paid some of Data's debts; and the defendants present no evidence showing that Data's debt to Kendall was paid from Data's bank account rather than Telecom's. (M.C.L. § 450.1833 expressly authorized Data to continue operating as needed to wind up its affairs after dissolution, including the payment of its debts, so there was no "need", under the statute, for Telecom rather than Data to pay Kendall for supplies sold to Data. On the contrary, M.C.L. § 450.1855a provides, in pertinent part, that "[b]efore making a distribution of assets to shareholders in dissolution, a corporation shall pay or make provision for payment of its debts, obligations, and liabilities.").

Next, the plaintiffs submit undisputed evidence that Data and Telecom had at least six customers in common, which tends to support an alter ego finding. *See, e.g., Trustees of the Painters Union Deposit Fund v. Interior/Exterior Specialist Co.*, 2008 WL 724355, *15 (E.D. Mich. Mar. 18, 2008) ("Aside from work subcontracted from TLG to IES, IES and TLG have some of the same customers. This factor weighs slightly in favor of the Trustees [who argued that IES and TLG were alter egos]."); *cf. Laborers Pension Trust Fund-Detroit & Vicinity v. Interior Exterior*

-43-

*Specialists Const. Group, Inc.*, 479 F. Supp.2d 674, 684-86 (E.D. Mich. Mar. 21, 2007) (Lawson, J.) (although there was no evidence that the defendant corporations pervasively intermingled funds and operations, the fact that they had the same employees prevented them from winning summary judgment on alter ego issue).  Most telling, in at least four instances Telecom collected payment for work that admittedly had been performed by Data.

As to the first common customer and possibly co-mingled customer payment, on April 23, 2005, *Data* invoiced the Community Mental Health Board of Clinton-Eaton-Ingham ("CMH") for a project entitled "CMH-Paging," then on August 12, 2005, *Telecom* invoiced CMH for a project entitled "Mental Health."  *See* MSJ Ex F at 1-2.

As to the second common customer and co-mingled customer payment, on May 7, 2005, Data twice invoiced Central Michigan Community Hospital for a project called CMCH.  *See* MSJ Ex F at 4 & 6.  Data was officially dissolved in June 2005, and on July 28, 2005 it was *Telecom* which received that customer's check *payable to Telecom* – the amount was precisely the total of Data's two invoices combined.  The defendants do not claim that the check represented payment for any work done by Telecom.  Price had this exchange with counsel:

Q.      * * * Another example that I came across . . . was an invoice from Data to Central Michigan Community Hospital, I believe it's in Mt. Pleasant.
A.      Yes.

Q.      [T]here were two invoices, one dated May 7 of '05, for job number 1203 for $450.  Another one dated the same day . . . for job number 1212 for $21,845. Those were both invoices from Data to the hospital.  The invoice was then later paid by the hospital on July 28th of '05, after Data closed.  That check was made payable to Telecom for $22,295 which happens to be the sum of those two invoices.

        Can you explain that transaction to me?

A.      It sounds like we sent them an invoice in Data, and then after we had shut

-44-

down the company, that we received a check to Telecom.

Q.     Okay.  What did Telecom do with the check?
A.     I'd have to look.

Q.     Okay.  Is it possible that Telecom deposited the check into Telecom's own account?
A.     Yes.

Q.     Okay.  *So is it fair to say that Telecom was receiving money owed to Data, and depositing that money into its own accounts?*
A.     *Yes.*

Q.     Okay.
A.     Very hard to make a complete cutoff there.

Q.     *Another invoice from Data sent to the same hospital* on May 31st of '05, was for, also for job 1212.  The invoice was for $36,964.78.  It was paid on June 30th of '05, after . . . Data had filed its dissolution.  *Was that check also deposited to the Telecom account?*
A.     *Most likely.*

MSJ Ex B (Price Dep) at 64:25 to 66:10 (emphasis added).

As to the third common customer or instance of co-mingled customer payment, *Data* executed a subcontract with in May 2005 with Thatcher Construction Company, Inc., of East Lansing, Michigan ("Thatcher") on a project at Haslett Animal Hospital in Haslett, Michigan.  *See* MSJ Ex F at 8-10 (subcontract) and 15 (Data's "partial unconditional waiver" of construction lien for labor/materials provided at Haslett Animal Hospital).  Yet it was *Telecom* which invoiced Thatcher in July and August 2005 for electrical work done at the animal hospital.  *See* MSJ Ex F at 11-14.  Telecom also accepted payment that Data had performed as subcontractor to Thatcher on another project, the Fifth Third Bank project.  *See* MSJ Ex B (Price Dep) at 66:11-19 (Price testifies that a $771.76 check payable to Data for work done at Fifth Third was "most likely" deposited into Telecom's bank account).

-45-

As to the fourth common customer or co-mingled customer payment, *Data* filled out a Daily Time & Material Sheet on May 24, 2005 which listed the customer as "Frank" and had the name "Butterfield" handwritten across the top.  *See* MSJ Ex F at 17.  Yet it was *Telecom* which invoiced a "Frank Butterfield" of Lansing, Michigan, apparently for that very job, on July 5, 2005, and received payment from "Butterfield Realty."  *See* MSJ Ex F at 16 and Ex I at 1.

As to the fifth common customer or co-mingled customer payment, *Data* invoiced the Michigan Commission for the Blind $1,024.88 in April 2006 for work done on the "Hall of Justice" project, and sent a letter in May 2005 reminding the Commission to pay.  *See* MSJ Ex L at 1-2. Then in November 2005, December 2005, and March 2006, *Telecom* re-invoiced the Commission for that same amount on that same project and sent a letter informing the Commission that the balance was overdue; the Commission then sent a $1,024.88 check, and the check stub provided in the record does not make clear whether the payee was Data or Telecom.  *See* MSJ Ex L at 3-4 (Telecom's Nov. and Dec. 2005 invoices to Commission) and MSJ Ex B (Price Dep) at 668:19 to 69:16 (when asked whether it was "fair to say that Telecom was invoicing for work performed by Data for that project", Price responded "I would say so.  I would like to see all of these to make sure.").

The court also finds it significant that the employee roster of the companies stayed mostly the same during the transition from Data to Telecom.  During the quarter ending June 30, 2005 – the quarter in which Data dissolved – Data paid wages to eight employees:  Price, Glanz, Trevor Price, Patrick Price, Gloria Price, Joshua Schilling, and Robert Van Arkel.  *See* MSH Ex H at 4.  As the table below will show, Telecom kept seven of Data's eight employees, while adding three:

| Data | Telecom | Telecom | Telecom |
|------|---------|---------|---------|

| 2Q '05 | 1Q '07[17] | 2Q '07 | 3Q '07 |
|---|---|---|---|
| James Price | James Price | James Price | James Price |
| Kevin Glanz | Kevin Glanz | Kevin Glanz | Kevin Glanz |
| Gloria Price | Gloria Price | Gloria Price | Gloria Price |
| Patrick Price | Patrick Price | Patrick Price | Patrick Price |
| Trevor Price | Trevor Price | Trevor Price | Trevor Price |
| Joshua Schilling | Joshua Schilling | Joshua Schilling | Joshua Schilling |
| Robert Van Arkel | Robert Van Arkel | Robert Van Arkel | Robert Van Arkel |
| Lloyd Wendt | — | | |
| — | T. McDiarmid | T. McDiarmid | T. McDiarmid |
| — | Martie Stone | Martie Stone | Martie Stone |
| — | Steven Wyse | Steven Wyse | Steven Wyse |

MSJ Ex H at 1-8.  The only person employed by Data at the time of its dissolution who did not definitely go on to be a Telecom employee was Lloyd Wendt, who was employed by Data for only three days.  *See* MSJ Ex B (Price Dep) at 20:20 to 21:12 (at the request of a union official, Data let Wendt go because he was not a union member).  And Price himself testified that Wendt *may* have become a Telecom employee:  Price recalled that Wendt was re-hired for three months at a later time, but he could not say for sure whether it was Data or Telecom which re-hired him.  *See* MSJ Ex B (Price Dep) at 23:15-20.  Because the defendants are opposing summary judgment, the court assumes for purposes of this motion that Wendt was never employed by Telecom.

The substantial overlap between the employee rosters of Data and Telecom supports the premise that they were alter egos.  *See Allcoast*, 780 F.2d at 582-83 (substantial evidence supporting the NLRB's finding that companies were alter egos where, *inter alia*, "Ward Moving hired two of A.E. Ward's truck drivers as well as A.E. Ward's clerical staff."); *Michigan Glass & Glazing Indus. Defined Contribution Pension Plan v. Cam Glass, Inc.*, 2008 WL 506350, *10 (E.D. Mich. Feb. 22,

---

[17]It appears that the record does not contain Telecom employee lists for six quarters during the relevant period:  third quarter 2005 through fourth quarter 2006.

2008) (in support of finding that companies were alter egos, court noted that "at least three installers . . . worked for both companies for some period of time"); *contrast Crawford v. TRW Automotive U.S., LLC*, 2007 WL 4591869, *2 (E.D. Mich. Dec. 28, 2007) (Duggan, J.) (adhering to grant of summary judgment to defendant employer on alter ego issue where, *inter alia*, "The Van Dyke plant had a salaried staff of 37 employees.  Of the approximately 20 salaried staff at the Mancini Drive facility, only five of these employees ever worked at the Van Dyke plant.").

Finally, Price testified that when Data dissolved, he, Gloria Price, and Kevin Glanz received a distribution of Data's remaining funds, which they promptly deposited into the bank account established for Telecom.  Price had this exchange with plaintiffs' counsel:

Q.      * * * Was any of the money in the account with Summit Bank for Data used to capitalize Telecom when Data closed?
A.      Once it was [distributed] to the shareholders, did they, what they did with the money at that time?

Q.      Yes.
A.      I want to say that it could have been.  I mean once the money was distributed was it the same money that went back in?
Q.      Yes.
A.      I would say some of it probably did.

Q.      What did you do with your money from the distribution of the account at Summit Bank from Data?
A.      It was transferred to an account at NuUnion Credit Union.
                                        * * *
Q.      Okay.  So you took the money you received for your hares of Data and transferred it into the accounts held by Telecom at State – what was then State Employees Credit Union and now is called NuUnion Credit Union?
A.      Yes.

Q.      How about the money received by your wife from the dissolution of Data? Did she also take that money and capitalize the account for Telecom?
A.      Capitalize?

Q.      Did she deposit the money into the account for Telecom?
A.      I believe that she did, yes.

-48-

* * *

> Q.      Do you happen to know if Mr. Glanz also used his distribution from Data and deposited it into the account for Telecom?
>
> A.      Yes.

MSJ Ex B (Price Dep) at 15:13 to 16:18.  Price explained that although Michael Hayes was the fourth shareholder of Data, he did not receive any of Data's remaining funds when it was dissolved. *Id.* at 16:19 to 17:1.  In other words, Telecom's start-up capital came at least in part from Data's funds with little or no delay, and all of Data's funds were used for that purpose.

In light of Data and Telecom's identical location and nature; substantially common ownership, control, equipment, supplies, contact information, customers, and employees; the fact that Data's left-over funds were used to capitalize Telecom; and the fact that Telecom received payment for work done by Data, there is no genuine issue of <u>material</u> fact as to whether Data and Telecom were alter ego.  They were, because

> when there is a "mere technical change in the structure or identity of the [old] employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management . . . the courts have little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor."

*Yolton*, 435 F.3d at 586 (quoting *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 259 n.5 (1974) (citing *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942))).[18]

---

[18]

This finding does not rest on any notion that Price and Glanz dissolved Data or formed Telecom in order to evade their CBA obligations, as the plaintiffs surmise.

The defendants contend that because Price & Glanz *et al.* signed the paperwork to create Telecom before the plaintiffs ever demanded payment of CBA contributions, they could not have created Telecom with the intent of evading a *known* CBA obligation.  *See* Opp'n at 14-15.  For their part, the plaintiffs have presented circumstantial evidence from which a reasonable factfinder might infer that Price and Glanz dissolved Data and created Telecom with the intent of evading Data's CBA obligations.  *See generally Allcoast*, 780 F.2d at 583 ("When the circumstances so strongly support a finding of alter ego status, as they do here, the [NLRB] can properly weigh all of the

-49-

Accordingly, the court will hold Telecom liable for the CBA obligations of Data, as if Price had signed the letters of assent on behalf of both Data and Telecom.  *See Iron Workers' Local No. 25 Pension Fund v. MCS Gen. Contractors, Inc.*, 229 F.3d 1152, 2000 WL 1276730, *1 n.2 (6th Cir. Aug. 30, 2000) ("Structural is not formally a signatory to the CBA; however, it effectively became a signatory when the district court ruled that is the alter ego of General [which signed the CBA].").

<u>No Genuine Issue as to Whether Price & Glanz Breached Fiduciary Duty under ERISA</u>

In their opposition to the fiduciary-duty claim, the defendants argue that they had no fiduciary duty to reserve funds for the payment of employee benefits under the CBAs because (1)

> Telecom is not a party to a collective bargaining agreement and Data was not required to pat union scale wages or fringes pursuant to its [oral] arrangement with Local 665.  Since that fringe benefit cost was not bid, no amounts were received by Data or Telecom for fringes.  Data's employees were paid wages based on the amounts bid or estimated for the work, which did not include union scale wages or fringe benefits.  Plaintiffs have identified no funds received on specific jobs by Data or Telecom which were for payment of fringe benefits.
>
> Without having received any fringe benefit funds, no trust ever applied to Data's funds under . . . ERISA . . . .

* * *

---

factors and *infer* that the employer intended to evade union obligations.").  Evidence suggesting an intent to evade, however, merely precludes the court from granting summary judgment *to the defendants*.  Only the *plaintiffs* here have moved for summary judgment.

As noted above, the relaxed alter ego standard applicable in federal labor-law disputes does not strictly require a finding that the corporate form was intentionally used to evade labor-law / CBA obligations, and the other evidence is so strong as to compel the finding that Data and Telecom were alter egos even in the absence of such a finding as to intent.  *See Allcoast*, 780 F.2d at 583 ("An inquiry into employer intent may be appropriate in other situations involving application of the alter ego doctrine but here it is simply not necessary."); *Trustees of Painters Union Dep. Fund v. Interior/Exterior Specialist Co.*, 2008 WL 724355, *16 (E.D. Mich. Mar. 18, 2008) (in *Wilson*, 83 F.3d 747, the Sixth Circuit upheld an alter ego finding, and "[n]otably, there was no consideration of intent to evade.").  Therefore, the court intimates no opinion as to whether Price and Glanz dissolved Data and created Telecom with the intent of evading Data's ERISA / CBA obligations.

-50-

> While Plaintiffs state in their Brief that Defendants received funds on behalf of Plaintiffs and used them for other purposes when monthly fringe contributions went unpaid, there has been *no proof* and no showing of payments for contributions received by either Data or Telecom for *any project*.

Opp'n at 15-18 (emphasis in original).

The defendants' arguments lack merit.  First, this court has already determined that (1) the letters of assent bound Data to the three CBAs because federal common law forecloses the defenses of oral modification, waiver, and estoppel, and (2) Telecom is the alter ego of Data.  Therefore, Data and Telecom were and are obligated to pay union wages and benefits to the extent required by the CBAs.   Second, it is irrelevant whether Data or Telecom made their bids/estimates high enough to cover the cost of complying with the CBAs.  It is also irrelevant whether part of their customers' payments were understood (by Data/Telecom or by the customers) to defray the cost of compliance.  Data/Telecom were bound to make the benefit payments required by the CBA, and that obligation cannot be obviated by characterizing their employees as "non-union" workers, characterizing their projects as "non union" jobs, or extending offers to customers that were inadequate to pay CBA wages and benefits and still turn a profit.

The concept of what constitutes an ERISA plan "asset" must be broadly construed.  *See, e.g., Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987) ("[P]rotection of beneficiaries and notice to fiduciaries requires that [29 U.S.C. § 1106(b), prohibiting certain transactions involving plan *assets*] be broadly construed . . . ."); *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984) ("The protective provisions of [29 U.S.C. § 106] (a)(1)(D) [prohibiting the transfer of ERISA plan assets to, for the use of, or for the benefit of a party in interest] and (b)(1) [prohibiting a plan fiduciary from dealing with plan assets on his account or his own interest] should be read broadly . . . .").

-51-

A company's contributions to benefit funds constitute plan assets under as they become due. *Operating Engineers Local 324 Fringe Benefit Funds v. Nicolas Equip., LLC*, 353 F. Supp.2d 851, 854 (E.D. Mich. 2004) (Edmunds, J.) (quoting *So. Elec. Health Fund v. Kelley*, 308 F. Supp.2d 847, 867 n.10 (M.D. Tenn. 2003) (citing, *inter alia*, 29 C.F.R. § 2510.3-102). In other words, "*unpaid fringe benefit contributions . . . are plan assets.*" *Nicolas Equipment*, 353 F. Supp.2d at 854.

Under 29 U.S.C. § 1002(21)(A), a person is defined as an ERISA plan fiduciary "to the extent" that he "exercises any discretionary authority or discretionary control respecting management or disposition of its assets . . . ." As Chief Judge Bell has noted, "Consistent with the Congressional intent to safeguard the interests of ERISA participants and their beneficiaries, courts – in this Circuit and elsewhere – have generally construed the term 'fiduciary' broadly." *Tregoning v. Am. Cmty. Mut. Ins. Co.*, 815 F. Supp. 1054, 1058 (W.D. Mich. 1992) (citing *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir. 1988) and sister circuits), *aff'd o.g.*, 12 F.3d 79 (6th Cir. 1993). *See also Roofers Local 149 Sec. Ben. Trust Fund v. Milbrand Roofing Group, Inc.*, 2007 WL 835802, *1 (E.D. Mich. Mar. 14, 2007) (O'Meara, J.) (citing *LoPresti*, 126 F.3d at 40 (Congress intended ERISA "fiduciary" to be broadly construed)), *recon. denied*, 2007 WL 1775363 (E.D. Mich. June 20, 2007); *Sawlocki v. Rama Tech, LLC*, 2005 WL 3358855, *7 (E.D. Mich. Dec. 9, 2005) (Battani, J.) (same) (quoting *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987)); *Criss v. Hartford Acc. & Indem. Co.*, 1991 WL 640066, *9 n.3 (E.D. Mich. Aug. 26, 1991) (Rosen, J.) ("[T]he courts have construed the term 'plan fiduciary' rather broadly.") (citing, as an example, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)), *aff'd*, 963 F.2d 373, 1992 WL 113370 (6th Cir. May 28, 1992).[19]

---

[19]

*Accord In re AEP ERISA Lit.*, 327 F. Supp.2d 812, 826 (S.D. Ohio 2004) (Marbley, J.)

The question, then, is whether Price and Glanz exercised any discretionary authority over the "management or disposition of" the unpaid benefit contributions, that is, funds that could have been used to pay those contributions.  It is undisputed that Price was both President and a shareholder of both Data and Telecom, and he testified that he and his wife (but not Glanz) "would have been the person to sign the checks" for benefit contributions if Data had made such contributions.  *See* Opp'n Ex B (Price Dep) at 41.  This testimony alone establishes beyond genuine material dispute that Price had the discretionary authority to use Data or Telecom's funds to pay CBA contributions or direct them to some other purpose, so the court finds that Price is an ERISA fiduciary.  *See LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (holding that president of closely-held corporation was an ERISA fiduciary personally liable for unpaid fringe benefit contributions because, instead of depositing the owed contributions with the Funds, he used that money to pay the corporation's other creditors).

It is also undisputed that Glanz was the Secretary and 34% shareholder of Data, then Vice-President and 25% shareholder of Telecom.  *See* MSJ Ex. D & E (Articles of Incorporation).  The Articles of Incorporation do not spell out the powers or duties assigned to the four officers of either corporation, *see* MSJ Exs. D & E, nor have the parties submitted any by-laws or other writings that purport to define each officer's powers or duties.  The record does not contain any affidavit or deposition testimony by Glanz himself.  Price testified that Glanz was never authorized to write checks on behalf of Data or Telecom, *see* MSJ Ex B (Price Dep) at 41:18 to 43:3.  Crucially, however, Price admitted that Glanz was a decision-maker when Data lacked funds to meet all its

_____

(citations omitted); *McFadden v. R&R Engine & Machine Co.*, 102 F. Supp.2d 458, 467 (N.D. Ohio 2000) (O'Malley, J.) (citation omitted).

obligations and had to choose which ones to pay on time:

> Q. Was there always enough money in the accounts of Data to pay the bills of Data when the bills became due?
> A. Not always.
> Q. So sometimes some bills of Data did not get paid.
> A. Yes.
>
> Q. Okay. And *who at Data made the decision of which billings [sic] to pay and not pay when there wasn't enough money at Data to pay those bills?*
> A. *Probably a joint decision between myself, Gloria [Price], and Kevin [Glanz].*
>
> Q. Okay. *So all three of you had input in the discretion of which of the bills not to pay?*
> A. It was a rare occasion.
> Q. Okay.
> A. But *yes*.

MSJ Ex B (Price Dep) at 44:19 to 45:7 (emphasis added). Accordingly, by Price's own testimony, the court concludes that Glanz had sufficient discretionary authority over the "management or disposition of" Data's funds to make him an ERISA fiduciary. *See Best v. Cyrus*, 310 F.3d 932, 934-35 (6th Cir. 2002) (a person is an ERISA fiduciary if he has "any" discretionary authority or control respecting the management or disposition of the plan or plan assets). The court finds that, like Price, Glanz breached this fiduciary duty by failing to at least endeavor to have corporate funds used to pay the delinquent CBA contributions.

Finally, in opposing the fiduciary-duty claim, the defendants state, "by looking at the facts involved carefully, they show that each company was run in a responsible, good faith manner and not with the intent to defraud anyone." Opp'n at 18. That may be true, but it is immaterial. The defendants cite no authority for the proposition that evidence of an intent to defraud is a prerequisite for finding that a corporate officer was an ERISA fiduciary. Nor do they cite authority holding that evidence of intent to defraud is a prerequisite for a finding that a corporate officer breached that duty

-54-

by failing to ensure that the company made ERISA/CBA-required contributions.  On the contrary, "a potential fiduciary's state of mind is irrelevant because Congress intended 'fiduciary' to be construed broadly . . . ."  *Chao v. USA Mining, Inc.*, 2007 WL 208530, *9 (E.D. Tenn. Jan. 24, 2007) (Collier, C.J.) (citing *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir. 1984) (discussing H.R. DOC. NO. 93-1280)).

<u>No Need to Consider Piercing the Corporate Veil</u>

The Fund asks the court to pierce the corporate veil of Data and/or Telecom and hold Price and Glanz personally liable for Data/Telecom's CBA benefit debts.  The court notes the difference between this analysis and the analysis already performed on the alter ego issue:

> [T]here is no such thing as a "veil-piercing version of the alter ego doctrine." [The v]eil piercing and alter ego concepts are separate and distinct.  In general, efforts to pierce a corporate veil ask a court to hold *A* vicariously liable for *B's* debts.  By contrast, a contention that A is B's alter ego asserts that A and B are the same entity; liability then is not vicarious but direct.

*UAW v. Aguirre*, 410 F.3d 297, 310 (6th Cir. 2005) (other internal citations and quotation marks omitted).  This court has already determined that by failing to pay funds to the plaintiffs' trusts to defray Data/Telecom's CBA benefit obligations, Price and Glanz violated their fiduciary duties under ERISA and are personally liable for Data/Telecom's CBA benefit debts on that basis.  Accordingly, it would be superfluous to consider whether Price and Glanz could also be held personally liable under the doctrine of piercing the corporate veil.

<u>Michigan Courts Can Address the MBCFA Claim</u>

Having disposed of the federal claims, the court exercises its discretion under 28 U.S.C. § 1367(c)(3) and declines supplemental jurisdiction over the state-law claim.  *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) "[A] federal court that has dismissed a plaintiff's

federal-law claim should not ordinarily reach the plaintiff's state-law claims.") (citing 28 U.S.C. §
1367(c)(3) and *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly if the
federal claims are dismissed before trial . . . the state claims should be dismissed as well.")).

Justice and comity are served by deferring to Michigan's courts, which are best equipped to
interpret and apply their own State's law in the first instance.  *See Widgren v. Maple Grove Twp.*,
429 F.3d 575, 585 (6th Cir. 2005) ("[T]he district court did not abuse its discretion in declining to
exercise supplemental jurisdiction over the state law issues based on its consideration of the interests
of justice and comity best served by a state court's resolution of the remaining state law claims.").[20]

### ORDER

Upon consideration of the plaintiffs' motion brief, the defendants' opposition brief, the
plaintiffs' reply brief, and the record, the plaintiffs' motion for summary judgment is **partially
GRANTED, partially DENIED without prejudice as moot**, and **partially DENIED without
prejudice.**

---

[20]

*See, e.g.,* exercising 28 U.S.C. § 1376(c)(3) discretion to decline supplemental over state-law
claims and dismiss those claims without prejudice:

*Westberg v. Russell*, 2008 WL 205208, *1 (W.D. Mich. Jan. 23, 2008) (Enslen, J.);
*Poindexter v. McKee*, 444 F. Supp.2d 783 (W.D. Mich. 2006) (Miles, J.);

*Reinhardt v. Dennis*, 399 F. Supp.2d 803, 811 (W.D. Mich. 2005) (McKeague, J.);

*Glover v. Elliott*, 2007 WL 4557853, *5 (W.D. Mich. Dec. 21, 2007) (Bell, C.J.) ("In light
of the entry of summary judgment on Plaintiff's federal claims at an early stage . . . , the Court finds
no good reason to exercise supplemental jurisdiction over Plaintiff's state law claims.");

*Forner v. Robinson Twp. Bd.*, 2007 WL 2284251, *8 (W.D. Mich. Aug. 7, 2007) (Quist, J.);

*Henderson v. Caruso*, 2007 WL 1876471 (W.D. Mich. June 28, 2007) (adopting R&R of
Greeley, M.J.); *Williams v. Grand Rapids Pub. Library*, 2007 WL 3346625, *7 (W.D. Mich. Nov.
9, 2007) (adopting R&R of Scoville, M.J.);

-56-

<u>The plaintiffs' motion for summary judgment is GRANTED to the following extent</u>:

Defendant Encompass Electric & Data, Inc. ("Data") **IS LIABLE** for employee benefit contributions required by the collective bargaining agreements ("CBAs") that are referred to in the three letters of assent signed by defendant James K. Price, Jr. ("Price"), in his role as President of Data, on October 10, 2003.

For purposes of the federal claims in this case only, Defendant Encompass Electric & Telecom, Inc. ("Telecom") **SHALL BE CONSIDERED** the alter ego of Data under federal common law. Accordingly, Telecom **IS LIABLE** for Data's employee benefit contribution, reporting, and audit obligations under the CBAs.

Defendants Price and Kevin Glanz ("Price") **ARE PERSONALLY LIABLE, jointly and severally,** for the CBA obligations of Data and Telecom, due to their breach of ERISA fiduciary duties.

All pertinent records of Data and Telecom **SHALL** be made available to the plaintiffs for such inspection and audit as necessary to determine whether Data (and therefore Telecom) has additional employee-benefit liabilities under the CBAs.

The plaintiffs' motion for summary judgment is **DENIED WITHOUT PREJUDICE AS MOOT to the following extent**: Having determined that Price and Glanz are personally liable for Data/Telecom's CBA debts because of their breach of their ERISA fiduciary duty to pay benefits required by the CBAs, the court need not consider whether they might also be held personally liable for such debts on any other basis, such as a piercing of the corporate veil of Data and/or Telecom.

Pursuant to 28 U.S.C. § 1367(c), the court **DECLINES SUPPLEMENTAL JURISDICTION OVER** the claim for violation of the Michigan Building Contract Fund Act,

M.C.L. § 570.151 *et seq.* ("MBCFA").  That claim is dismissed without prejudice.

No later than September 1, 2008, the plaintiffs **SHALL FILE** (1) an itemized list of the amounts that it believes are owed by the defendants on behalf of Data and Telecom employees under the CBAs from the date of Data's inception through the present (or through the date on which the applicable CBAs terminated, if applicable), separately showing each category of unpaid contribution, unpaid dues, late fees, interest, liquidated damages, and other charges; and (2) an itemized list of the attorney fees and costs that it believes are owed by the defendants. *See* 29 U.S.C. § 1132(g)(2).  The determination of the amounts owed by the defendants, including attorney fees, **IS REFERRED** to the Hon. Ellen S. Carmody, United States Magistrate Judge, for a binding determination pursuant to 28 U.S.C. § 636(a)(1)(B).

This is a final and appealable order.

**IT IS SO ORDERED this 19th day of May 2008.**

/s/Paul L. Maloney
Honorable Paul L. Maloney
United States District Judge